# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>**SHANTERIA BARNES,**<br><br>*Defendant(s)* | Case No. 20-6641-SNOW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of __July 2020 through August 14, 2020__ in the counties of _____Broward_____ in the __Southern__ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a)(1), (b)(1) and (b)(2) | Sex Trafficking of A Minor (two counts) |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Alex G. Loff, Special Agent, FBI
Printed name and title

Sworn to before me telephonically.

Date: December 11, 2020

_____
Judge's signature

City and state: Fort Lauderdale, Florida

Lurana S. Snow, United States Magistrate Judge
Printed name and title

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Alex G. Loff, a Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2018. Thus, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, violations of federal law, including the offenses enumerated in Title 18, United States Code, Sections 1591, 2422, 2423, 2251, and 2252, et seq.

2. I currently serve as part of the Crimes Against Children squad and the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF) in the FBI's Miami Field Office. My duties include the investigation of crimes involving the sexual exploitation of minors, including the sex trafficking and commercial trafficking of minors and the possession and production of child pornography. I have received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants. I have conducted and assisted in several child exploitation investigations and have executed search warrants that have led to seizures of child pornography and undercover operations to recover juvenile victims of sex trafficking.

3. This Affidavit is submitted in support of a criminal complaint charging **Shanteria Barnes (hereinafter, "BARNES")** with two counts of sex trafficking of a minor, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), and (b)(2).

4. This Affidavit is based upon my personal knowledge, as well as information learned from other law enforcement agents, investigators, witnesses, and documents. This Affidavit is submitted for the limited purpose of establishing probable cause in support of a search warrant; as such, it does not include each and every fact known to the government about this investigation.

## PROBABLE CAUSE

5. As explained below, there is probable cause to believe that, from in or around July 2020 through on or about August 14, 2020, in the Southern District of Florida, BARNES did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, advertise, maintain, and solicit by any means a person, that is, Minor Victim 1 and Minor Victim 2, knowing, and in reckless disregard of the fact, and having had a reasonable opportunity to observe Minor Victim 1 and Minor Victim 2, that Minor Victim 1 and Minor Victim 2 had not attained the age of 18 years and would be caused to engage in a commercial sex act.

### MINOR VICTIM 1

6. On or about August 12, 2020, members of the Child Exploitation and Human Trafficking Task Force ("CEHTTF") responded to a hospital located in Tamarac, for the recovery of an 11-year-old female ("Minor Victim 1"), who was reported missing to law enforcement by her family.

7. Minor Victim 1 was interviewed on two separate occasions. During her interviews, Minor Victim 1 stated that while she was away from her family, she stayed at a Days Inn Hotel located at on Oakland Park Blvd in Fort Lauderdale ("Oakland Days Inn"). During that time, she met BARNES. BARNES introduced herself as "Pumpkin" and asked Minor Victim 1 to dance for her to see if Minor Victim 1 knew how to. When Minor Victim 1 was able to dance and do a split, BARNES was impressed and told Minor Victim 1 that she would pay her $60 to

strip at BARNES' aunt's birthday. BARNES also told Minor Victim 1, "oh bitch, I got money cause I fuck," and showed Minor Victim 1 videos and pictures of people with wads of cash in order to show Minor Victim 1 how much money she could make engaging in commercial sex acts.

8.     Minor Victim 1 stated that BARNES would arrange "dates" for both herself and Minor Victim 1 to engage in commercial sex. BARNES had the "dates" come to BARNES' residence so that she could discuss the terms of the "date." On one occasion, BARNES instructed the men which hotel they would be meeting at, told them whether Minor Victim 1 would be stripping for them, and how much it would cost.

9.     When the men would arrive at BARNES's residence for the "date," BARNES would drive Minor Victim 1 in a two-door silver vehicle, with the men following behind in their own vehicle, to a nearby hotel in Pompano Beach for the "date." The men would be the one to rent the hotel rooms. At times, both BARNES and Minor Victim 1 would be in separate rooms on "dates," while other times, BARNES and Minor Victim 1 would share a room during the "dates."

10.    Minor Victim 1 stated that in addition to BARNES coordinating "dates" for Minor Victim 1 at this hotel, Minor Victim 1 also had "dates" coordinated by BARNES at other hotels throughout Broward County.

11.    On these "dates," BARNES told Minor Victim 1 not to accept anything less than $40 to engage in sexual activities. Minor Victim 1 stated that for $30, she would strip for the "dates," and starting at $40, she would have sex with the men. Minor Victim 1 advised that she was unaware if BARNES would secretly take a cut from the monetary arrangement with the men prior to Minor Victim 1's "dates," but Minor Victim 1 did advise that on at least one occasion,

she gave BARNES money from one of her "dates" for gas money.

12.     Minor Victim 1 stated that she was with BARNES, engaging in sexual acts for money, for approximately four days and made approximately $150 per day. During the first interview, Minor Victim 1 explained that on one occasion, she had approximately 10 "dates" in one day, and during the course of her stay at the hotels with BARNES, she engaged in approximately 15-17 "dates."  During the second interview, Minor Victim 1 stated that she engaged in approximately 14 "dates" at the direction and arrangement of BARNES.

13.     The money that Minor Victim 1 received from the "dates" that BARNES arranged for her, BARNES told Minor Victim 1 not to use the money on insignificant things like a Nintendo Switch or a game controller, which Minor Victim 1 wanted to purchase. When Minor Victim 1 told BARNES that she wanted to buy a toy car "big enough to ride in because it would be fun," BARNES advised Minor Victim 1 to spend the money on clothes for herself, or another cellular phone since Minor Victim 1's phone was broken.

14.     When Minor Victim 1 first met BARNES, she told BARNES that she was 17-years-old. Minor Victim 1 also advised BARNES that she could not be seen in public because she had been reported missing by her family. Minor Victim 1 stated that BARNES used to tell Minor Victim 1 that Minor Victim 1 "acts like a kid" and is "always hyper." BARNES would often compare Minor Victim 1's behavior to BARNES' own 12-year-old daughter.

### MINOR VICTIM 2

15.     Contact was made with a 15-year-old female ("Minor Victim 2") during two separate interviews on or about August 20, 2020 and December 1, 2020. During the interviews with Minor Victim 2, she stated she met BARNES while Minor Victim 2 was at a group home in Pompano Beach, and walking to the nearby corner store. Minor Victim 2 knew BARNES as

"Pumpkin" and identified BARNES to law enforcement from a photograph. When they met, BARNES told Minor Victim 2 that she was 19-years-old, but then eventually admitted to Minor Victim 2 that she was 30-years-old.

16.     While Minor Victim 2 and BARNES started spending time together, BARNES began bringing older men – believed to be in their forties – to BARNES' residence for "dates." Minor Victim 2 would go into the other room while BARNES was on a "date," and when Minor Victim 2 would close the door as she left the bedroom, BARNES insisted on keeping the door open so she could see Minor Victim 2 in the event that Minor Victim 2 would try to leave BARNES' residence.

17.     Minor Victim 2 and BARNES got into verbal arguments over the men that BARNES would bring to BARNES' residence. BARNES would tell Minor Victim 2, "you'll never be more than a group home hoe." BARNES also began telling people that Minor Victim 2 was homeless.

18.     On one occasion, BARNES asked Minor Victim 2, and Minor Victim 2's 17-year-old friend ("Minor Victim 3") from the same group home, if they wanted to make $150 doing Minor Victim 1's hair at a room in a hotel in Broward County. Minor Victim 2 was surprised because she knew this particular hotel was associated with prostitution. BARNES drove Minor Victim 2 and Minor Victim 3 to the hotel in BARNES' two-door Toyota.

19.     While driving to the Oakland Days Inn, BARNES told Minor Victim 2 and Minor Victim 3 not to braid Minor Victim 1's hair too long because "she's not old enough for that." Minor Victim 2 understood that to mean that the girl is not "grown" and would not look good with long braids. When they got into the room, Minor Victim 2 and Minor Victim 3 began to braid Minor Victim 1's hair. Minor Victim 2 did not know Minor Victim 1's name, but Minor Victim 1

told Minor Victim 2 that she was 17-years-old. Minor Victim 2 identified a photograph of Minor Victim 1, as the girl whose hair they braided on that particular day.

20.     Minor Victim 2 stated that BARNES makes money from "dudes" she knows. Minor Victim 2 recalled multiple times where BARNES would be communicating with a man on her cellular telephone, via a call or text message, and would ask Minor Victim 2 if she wanted to make money. Minor Victim 2 inquired as to how and BARNES replied, "making love." When Minor Victim 2 told BARNES, "no," BARNES replied, "you're gonna be broke forever."

21.     On other occasions, BARNES would be speaking to a man in his vehicle in her driveway in front of BARNES' residence, and would come back inside asking Minor Victim 2 if she wanted to make money. Minor Victim 2 again said "no." Sometimes, BARNES would tell Minor Victim 2 that there is a man that wants to meet Minor Victim 2, and knows what Minor Victim 2 looks like. In response, Minor Victim 2 told BARNES to stop sending pictures to the men of her. Again, BARNES would tell Minor Victim 2, "you're gonna be broke forever." Minor Victim 2 believes that BARNES got Minor Victim 2's pictures from her Instagram account.

22.     Minor Victim 2 stated that BARNES knew Minor Victim 2's real age and that she and Minor Victim 3 were runaways. Minor Victim 2 specifically recalls informing BARNES that her 15th birthday was soon approaching, and that she ran away from her group home. Minor Victim 2 went with BARNES, in BARNES' car, to pick up Minor Victim 3 from the group home. Minor Victim 2 advised law enforcement that this was why BARNES would often call Minor Victim 2 and Minor Victim 3, "runaway hoes."

23.     Minor Victim 2 asked BARNES if she could reside with BARNES for a few days towards the end of July 2020, which BARNES agreed to. A few days into residing with BARNES at BARNES' residence, BARNES began asking for rent money. Minor Victim 2 stated that

BARNES was trying to act like her "pimp." Minor Victim 2 indicated that despite her never asking BARNES to post online advertisements of Minor Victim 2 for commercial sex acts, BARNES did so and would repeatedly bring men to the house in an effort to get Minor Victim 2 to engage in commercial sex acts. Every time Minor Victim 2 would leave the residence after being set up with a "date" by BARNES, but would return without money for BARNES, BARNES would tell Minor Victim 2 that she was "bad business."

24.     During Minor Victim 2's initial interview, she stated she did not engage in commercial sex acts. However, during her second interview with law enforcement, Minor Victim 2 admitted that she had engaged in commercial sex acts in the past. Minor Victim 2 advised that while she was living with BARNES, Minor Victim 2 met up with multiple men but could not recall if she engaged in commercial sex acts with them during this time period.

25.     On September 18, 2020, a Search Warrant was submitted to Facebook for BARNES' Facebook account. The Search Warrant returns revealed multiple audio messages sent from BARNES to Minor Victim 2, all of which occurred on or about August 2, 2020, discussing Minor Victim 2's age, including the following messages:

a.   "Hoe fuck you and your motherfucking business, nobody in your business hoe, you the one wanted my motherfucking licks[1] I put your young ass on [pause] line telling that bitch you 20 hoe"; and

b.   "You not 19 you 15 and I'm with him now and he know, dumb ass hoe, so he will never do business with you and whatever you owe him you can keep that cause you fucking needed it."

---

[1] Based on my training and experience, "lick" is street terminology for a commercial sex act.

26. Search Warrant returns from BARNES' Facebook account also show applications installed including a Skout account with an installation date of June 19, 2019.[2] A subpoena was submitted for the Skout account and the returns show that the Skout account was accessed from the IP Address associated with BARNES' residence.[3] A Search Warrant was submitted to Skout on November 25, 2020, and the returns contained multiple photographs of both BARNES and Minor Victim 2 on the Skout account. Minor Victim 2 identified one such photograph as her in BARNES' bedroom at BARNES' residence.

27. Law enforcement also located an online advertisement for commercial sex acts posted on or about July 26, 2020, on a popular website often utilized to advertise for commercial sex acts. This advertisement was posted on the website from the IP address associated with BARNES' residence. The email address associated with the advertisement contains the last name and first name initial of Minor Victim 2.

28. This same advertisement provided a contact number, which investigation revealed was associated with a TextNow account.[4] An investigation revealed that the account name belonging to the TextNow number was the last name and first initial of Minor Victim 2. Further, Search Warrant returns from TextNow revealed multiple communications between Minor Victim 2 and individuals discussing commercial sex acts. During one communication that occurred on or about July 27, 2020, which was during the time Minor Victim 2 was residing with BARNES,

---

[2] Based on my training and experience, I am aware that Skout is commonly used to advertise commercial sex acts and communicate with potential commercial sex act costumers.

[3] This is believed to be BARNES' residence as this location is consistent with the same residential description that the Minor Victims describe as belonging to BARNES, and Search Warrant returns from BARNES' Facebook Account reveal messages where BARNES advises she lives at this residence and asks customers to meet her at this residence.

[4] Based on my training and experience, I am aware that TextNow is commonly used to provide temporary phone numbers that can be changed, as desired, by the user.

Minor Victim 2 arranged a commercial sex act and advised the individual that the commercial sex act could take place at BARNES' residence.

### MINOR VICTIM 3

29. On or about September 10, 2020, contact was made with Minor Victim 3. During an interview of Minor Victim 3, she stated that she met BARNES through Minor Victim 2, who went to live with BARNES at BARNES' residence while she was a juvenile runaway.

30. Minor Victim 3 stated that BARNES engaged in sex acts for money, which she called "licks." BARNES told Minor Victim 3 that she gave Minor Victim 2, "like 3 of my licks." Minor Victim 2 showed Minor Victim 3 various cellular phone apps that Minor Victim 2 would use to engage in "dates" for herself and BARNES. On one occasion, while Minor Victim 2 and Minor Victim 3 were in the car with BARNES, Minor Victim 2 told Minor Victim 3 that she needed money to give to BARNES to pay rent. To do so, Minor Victim 2 called a "lick" who picked her up from BARNES' residence.

31. On a separate occasion, on the way to a hotel in Fort Lauderdale, Minor Victim 3 was in the backseat of a car with BARNES, while two men were in the front seat. BARNES told Minor Victim 3, "if we get nasty for them they'll pay us good" and attempted to kiss Minor Victim 3. Minor Victim 3 told BARNES, "no," and advised that BARNES was so angry from this, that BARNES went to the group home the following day and cursed out Minor Victim 3 to other girls.

## CONCLUSION

Based on the forgoing, I respectfully submit that there is probable cause to support a criminal complaint charging **Shanteria Barnes ("BARNES")** with two counts of sex trafficking of a minor, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1) and (b)(2).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
Alex G. Loff, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me telephonically this 11th day of December, 2020.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE