UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-6641-SNOW

UNITED STATES OF AMERICA,

v.

SHANTERIA BARNES,

    Defendant.
_____/

## DETENTION ORDER

THIS MATTER came before the Court upon the Government's motion to detain the Defendant, Shanteria Barnes, prior to trial and until the conclusion thereof. On December 30, 2020, I conducted a hearing wherein I received evidence and heard arguments of counsel. Having considered that evidence and those arguments, as well as the statutory factors in 18 U.S.C. § 3142(g), I hereby GRANT the Government's motion and order Defendant Shanteria Barnes detained prior to trial, for the reasons stated on the record at the hearing and as further discussed below in accordance with the provisions of 18 U.S.C. § 3142(i).

A.     INTRODUCTION

The Defendant is charged by Criminal Complaint with sex trafficking of a minor, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), and (b)(2). The United States sought detention on the bases of risk of non-appearance and danger to the community. On December 30, 2020, I held a hearing to determine whether any condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required and the safety of any person and the community. 18 U.S.C. § 3142(f). In order to detain a defendant pending trial, the Government must establish by preponderance of the evidence that no condition

or combination of conditions will reasonably assure the Defendant's appearance as required. *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). The Government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any individual or the safety of the community. 18 U.S.C. § 3142(f)(2). Based upon the evidence presented, specifically the allegations in the Criminal Complaint, I find probable cause that the Defendant committed an offense involving a minor victim under Title 18, United States Code, Section 1951. This finding gives rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). Assuming, *arguendo*, that a defendant comes forward with sufficient evidence to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988). Despite the presumption, however, the burden of persuasion is upon the Government to establish by clear and convincing evidence that the defendant poses a danger to the community, 18 U.S.C. § 3142(f), and/or to establish by a preponderance of the evidence that he poses a risk of flight. *Quartermaine*, 913 F.2d at 917. In determining whether the Government has met its burden by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).

B.   FINDINGS OF FACT

The evidence adduced at the pretrial detention hearing consisted of the information contained in the Pretrial Services Report, the Criminal Complaint [DE 1], and the testimony of FBI Special Agent Alex G. Loff. I considered all of this evidence in making my findings.

1. Government's Evidence

The Criminal Complaint [DE 1], and a few additional facts presented via proffer, were adopted by Special Agent Loff as his direct testimony. According to the Complaint, around August 12, 2020, members of the Child Exploitation and Human Trafficking Task Force responded to a hospital to recover an 11-year-old female (identified as "Minor Victim 1"), who had been reported missing. During interviews, Minor Victim 1 stated that while away from her family, she stayed at a Days Inn Hotel in Fort Lauderdale, Florida, where she met the Defendant. Special Agent Loff's testimony during cross-examination indicated that the Defendant's ex-boyfriend and/or another man were likely responsible for Minor Victim 1 being at the hotel. The ex-boyfriend is believed to have rented the hotel room.

According to the Complaint, the Defendant asked Minor Victim 1 to dance for her at the hotel. The Defendant told Minor Victim 1 that she would pay her $60 to strip at the Defendant's aunt's birthday and also told Minor Victim 1, "oh bitch, I got money cause I fuck." The Defendant showed Minor Victim 1 videos and pictures of people with wads of cash in order to show Minor Victim 1 she could make money engaging in commercial sex acts. Special Agent Loff's testimony indicated it was unclear whether the Defendant spent any significant amount of time at the hotel with Minor Victim 1 at that time. When the Defendant arrived at the hotel, Minor Victim 1 was naked. The Defendant took Minor Victim 1 to get some clothes and brought her back to the hotel. The Defendant later took charge of having Minor Victim 1's hair braided, as corroborated by statements of Minor Victims 2 and 3. The Defendant reportedly took Minor Victim 1 to the Defendant's residence to complete having Minor Victim 1's hair done.

Minor Victim 1 stated that the Defendant would arrange "dates" for both herself and Minor Victim 1 to engage in commercial sex. The Defendant had the "dates" come to her residence to

discuss terms.  On one occasion, the Defendant instructed the men which hotel they would be meeting at, told them whether Minor Victim 1 would be stripping for them, and how much it would cost.  After meetings at the Defendant's residence, the Defendant drove Minor Victim 1 to a nearby hotel for the "dates."  The men followed behind in their own vehicle and rented rooms at the hotel.  Sometimes the Defendant and Minor Victim 1 were on "dates" in separate rooms; other times they shared a room.  During cross-examination, Special Agent Loff acknowledged that while Minor Victim 1 stated that the Defendant set dates up for her, there are no postings corroborating Minor Victim 1's statement.  Special Agent Loff also acknowledged that the FBI has the Defendant's phone in its possession and that it has not recovered any concrete evidence (from the Defendant's phone) of the Defendant setting up dates for Minor Victim 1.

The Defendant told Minor Victim 1 the minimum amount she should accept on "dates" to engage in sexual activities.  Minor Victim 1 stated that she was with the Defendant, engaging in sexual acts for money, for approximately four days and made approximately $150 per day.  Minor Victim 1 explained that on one occasion, she had approximately 10 "dates" in one day, and during her time with the Defendant, she had approximately 14-17 "dates" arranged by the Defendant.

When Minor Victim 1 first met the Defendant, she told the Defendant that she was 17 years old and that she could not be seen in public because she had been reported missing by her family.  Minor Victim 1 said the Defendant used to tell her that she "acts like a kid" and is "always hyper," often comparing her behavior to the Defendant's own 12-year-old daughter.  The Defendant believed Minor Victim 1 to be 12 or 13 years old.

The task force also interviewed a 15-year-old female (identified as "Minor Victim 2") who stated she met the Defendant while living at a group home.  Minor Victim 2 identified the Defendant from a photograph. When they met, the Defendant, who knew Minor Victim 2's age,

4

told Minor Victim 2 that Defendant was 19 years old, later admitting she was 30 years old. The Defendant agreed to let Minor Victim 2 stay with her for a few days in late July 2020, but after a few days, the Defendant asked for rent money. It was unclear from Special Agent Loff's testimony whether it was the Defendant or the Defendant's step-father (one of the approximately seven people the Defendant lived with) who requested rent money from Minor Victim 2. In a post-arrest statement, the Defendant indicated that she rented a room from her step-father and that among the others living at the residence were two prostitutes living in a backyard shed. While with Minor Victim 2, the Defendant brought older men to her residence for "dates." Minor Victim 2 would go into the other room when the Defendant was on a "date." However, the Defendant insisted on keeping the door open so she could see Minor Victim 2 in case Minor Victim 2 tried to leave the Defendant's residence.

On one occasion, the Defendant asked Minor Victim 2 and Minor Victim 2's 17-year-old friend (identified as "Minor Victim 3"), from the same group home, if they wanted to make $150 doing Minor Victim 1's hair at a hotel. While driving them to the hotel, the Defendant told them not to braid Minor Victim 1's hair too long because "she's not old enough for that." Once at the hotel, they began to braid Minor Victim 1's hair. Minor Victim 2 identified a photograph of Minor Victim 1, as the girl whose hair they braided.

Minor Victim 2 also recalled multiple times where the Defendant, when communicating with different men, would ask Minor Victim 2 if she wanted to make money. When Minor Victim 2 asked how, the Defendant said by "making love." Minor Victim 2 declined, and the Defendant replied, "you're gonna be broke forever." On other occasions, the Defendant would be speaking to a man in his vehicle in the driveway in front of the Defendant's residence and would enter the house to ask Minor Victim 2 if she wanted to make money. Again, Minor Victim 2 says she said,

5

"no."  The Defendant sometimes told Minor Victim 2 that the men knew what she looked like, prompting Minor Victim 2 to tell the Defendant to stop sending pictures of her to the men.  Minor Victim 2 believes that the Defendant provided pictures from Minor Victim 2's Instagram account.

According to Minor Victim 2, the Defendant tried to act like her "pimp."  Minor Victim 2 indicated that she never asked the Defendant to post online advertisements of her for commercial sex acts but that the Defendant did so and repeatedly brought men to the house in an effort to get Minor Victim 2 to engage in commercial sex acts.  Minor Victim 2 provided potentially conflicting information during her two interviews as to whether she did engage in commercial sex acts.  During cross-examination, Special Agent Loff acknowledged that the FBI does not have any evidence indicating that the Defendant forced or coerced Minor Victim 2 to engage in commercial sex acts or solicitation.

A search warrant submitted to Facebook revealed multiple audio messages the Defendant sent to Minor Victim 2 around August 2, 2020, discussing Minor Victim 2's age, including the following: (a) "Hoe fuck you and your motherfucking business, nobody in your business hoe, you the one wanted my motherfucking licks I put your young ass on [pause] line telling that bitch you 20 hoe"; and (b) "You not 19 you 15 and I'm with him now and he know, dumb ass hoe, so he will never do business with you and whatever you owe him you can keep that cause you fucking needed it."  The information from Facebook indicated that a Skout application had also been downloaded.  Search warrant returns also revealed that a Skout account was accessed from the IP address associated with the Defendant's apparent residence and that photographs of the Defendant and Minor Victim 2 were on the Skout account.

Additionally, law enforcement located an online advertisement for commercial sex acts posted from the same IP address on or about July 26, 2020, which included an email address

containing the last name and first initial of Minor Victim 2. The advertisement also provided a contact number associated with a TextNow account. Law enforcement determined that the TextNow number was associated with the last name and first initial of Minor Victim 2, and search warrant returns from TextNow revealed communications between Minor Victim 2 and individuals discussing commercial sex acts. In one communication that occurred while Minor Victim 2 was residing with the Defendant, Minor Victim 2 arranged a commercial sex act and advised the individual that the commercial sex act could take place at the Defendant's residence. Special Agent Loff stated that approximately seven people were living at the residence, and he could not confirm that the Defendant actually posted information related to Minor Victim 2. He also acknowledged that Minor Victim 2 has had Skout accounts in the past and that it was unclear whether Minor Victim 2 had made the posts.

Law enforcement also interviewed Minor Victim 3 who said that the Defendant engaged in sex acts for money, which she called "licks." The Defendant told Minor Victim 3 that she gave Minor Victim 2, "like 3 of my licks." On one occasion, while Minor Victim 2 and Minor Victim 3 were in the car with the Defendant, Minor Victim 2 told Minor Victim 3 that she needed money to give to the Defendant to pay rent. To do so, Minor Victim 2 called a "lick" who picked her up from the Defendant's residence. On a different occasion, on the way to a hotel, Minor Victim 3 was in the backseat of a car with the Defendant while two men were in the front seat. The Defendant told Minor Victim 3, "if we get nasty for them they'll pay us good" and attempted to kiss Minor Victim 3. Minor Victim 3 told the Defendant "no," which she said angered the Defendant, who cursed her out to others at the group home the following day.

2. Pretrial Services Report

The Pretrial Services Report states the Defendant, who is 30, advised she has been renting a room for the past month and a half in Pompano Beach but that she was unable to recall the address. Although she keeps her belongings there, the Defendant said she has primarily resided with her romantic partner at a different location for the last month. The Defendant indicated that her partner lives there with roommates and no minor children. However, her partner stated that he has no roommates and that his three minor daughters (ages 3, 8, and 9) stay with him every other weekend. He also indicated that the Defendant has been primarily residing with him for the past six months.

According to the report, the Defendant stated that she lived with her mother before residing with her partner, and she said she could return to her mother's residence if released on bond. However, the Defendant's mother said that the Defendant did not live with her and that the Defendant has lived with a maternal aunt her entire life. Both of these claims are also contrary to the evidence presented at the hearing, which indicated that the Defendant was living at the residence with her step-father (and approximately six other people) and that commercial sex activity was occurring there.

The report also notes that the Defendant has never been employed. She receives SNAP benefits (food stamps), and she also receives social security benefits due to her mental health. As to her mental health, the Defendant was diagnosed with bipolar disorder and depression when she was 9. She is prescribed psychotropic medications, which the report indicates she has not taken in a month. Also, the Defendant was Baker Acted in 2016.

The report also details the Defendant's criminal history, which includes ten convictions over the last eleven years (excluding arrests resulting in no information or a nolle prosequi), with

the most recent arrest occurring eighteen months ago. While many arrests were for minor offenses, certain arrests were for more serious, and sometimes violent, offenses. For instance, the Defendant was previously arrested for shooting into a vehicle. For that offense, she received two years' probation, but she violated her probation. Additionally, the Defendant's criminal record is replete with capias entries (including capias entries from last year).

C.     STATEMENT OF REASONS FOR DETENTION

Title 18, United States Code, Sections 3142(g) requires the Court to consider the nature and circumstances of the offense, the weight of the evidence against Defendant, the history and characteristics of the Defendant, and the nature and seriousness of any danger to a person or to the community caused by the Defendant's release. After considering those factors in detail as described below, and based upon the above findings of fact, the Court specifically finds by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the Defendant's appearance at trial. 18 U.S.C. § 3142(e).

1.    The nature and circumstances of the offense charged.

The alleged offense of sex trafficking of a minor is incredibly serious. It involves the psychological manipulation of vulnerable victims into horrific behavior. While sex trafficking of any minor is abhorrent, here, Minor Victim 1 was eleven years old, making the crime particularly egregious. As described more fully below, the extent of the Defendant's involvement, particularly with Minor Victim 1, is not entirely clear and it is possible that the Defendant is not the one primarily responsible for bringing Minor Victim 1 into prostitution. Nevertheless, there is probable cause that the Defendant at least assisted, encouraged, and facilitated sex trafficking activities with Minor Victim 1. Such behavior with any minor, particularly one as young as Minor Victim 1, is particularly serious. Moreover, the Defendant knew that Minor Victim 1 was no older

9

than thirteen years old, and the Defendant knew that the other victims were minors. The crimes with which the Defendant has been charged are so serious that they carry mandatory minimum sentences of ten and fifteen years in prison, maximum sentences of life, and (by the Government's estimate) an advisory guideline of life in prison. As such, there is a strong incentive to flee.

    2. <u>The weight of the evidence against Defendant.</u>

The weight of the evidence against the Defendant is not overwhelming. The evidence consists of statements made by the 3 minor victims and certain evidence obtained from search warrants. With respect to Minor Victim 1, the only evidence of Defendant's involvement in, and responsibility for, Minor Victim 1's involvement in commercial sex comes from Minor Victim 1's statements, with the exception of the fact that the Defendant sought to have Minor Victims 2 and 3 braid Minor Victim 1's hair at the hotel (a fact which Minor Victims 2 and 3 corroborate). Nevertheless, the count of the Criminal Complaint pertaining to Minor Victim 1 is supported by probable cause given Minor Victim 1's statements to law enforcement and corroboration by Minor Victim 2 and Minor Victim 3, who did not know Minor Victim 1.

With respect to Minor Victim 2, it is again unclear the extent to which the Defendant is responsible for Minor Victim 2's participation in commercial sex activity. While it is clear that advertisements were posted of Minor Victim 2 for commercial sex purposes, based on Minor Victim 2's statements and the electronic evidence gathered, it is unclear whether Minor Victim 2, the Defendant, and/or someone else posted advertisements pertaining to Minor Victim 2. The IP address merely traced back to the Defendant's apparent residence, where approximately seven people were living at the time. The Criminal Complaint emphasized that the Defendant brought men to her residence for commercial sex while Minor Victim 2 was there, that Minor Victim 2 arranged a commercial sex act and suggested the Defendant's residence as a location for it, and

that Minor Victim 2 was pressured to pay rent at the residence (with the implication that she needed to engage in commercial sex in order to earn money for rent). Yet, it is unclear the extent to which the Defendant controlled the residence, asked Minor Victim 2 for rent, or enabled Minor Victim 2 to arrange for commercial sex activity there. Nevertheless, the evidence does at least suggest that the Defendant played a role in commercial sex activities related to Minor Victim 2, specifically in repeatedly encouraging her or offering opportunities to engage in those activities (even if Minor Victim 2 indicates that she declined). At bottom, while there is not necessarily overwhelming evidence that the Defendant actually acted as Minor Victim 2's "pimp," there is undoubtedly probable cause for the count of the Criminal Complaint related to Minor Victim 2 given the breadth of the applicable statute. *See* 18 U.S.C. § 1591 ("recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means").

    3.  <u>Defendant's history, characteristics, and criminal history.</u>

This factor heavily supports detention. The Defendant is only 30 years old, but she has accumulated numerous arrests over the last eleven years, including arrests for certain violent offenses. Moreover, she has previously violated probation, and her criminal record reveals a plethora of capias entries, demonstrating prior issues with appearing for court proceedings. In addition to the Defendant's lengthy criminal record, she also has a mental health history.

Although the Defendant grew up in this area and has family in the area, the Pretrial Services Report and testimony at the hearing raise serious concerns regarding where the Defendant has lived and where she would live if released. The Defendant's assertion that she lived with her mother and that she could return to her mother's residence is completely contradicted by her mother's statement that the Defendant had not been living with her and by the testimony at the hearing. I also find it noteworthy that while arguing she could live with her mother if released, the

11

Defendant's mother did not appear or testify at the detention hearing. Thus, I have no information to evaluate the suitability of her mother's residence or her mother's capacity to assist in ensuring the Defendant's compliance with the conditions of bond. In fact, the Defendant did not present any evidence to address her history or characteristics.

It is also concerning that the Defendant could not even recall the address at which she rents a bedroom and stores her belongings. Moreover, the Defendant's statement that she has lived with her boyfriend for the past month and her statements that the boyfriend has roommates but no minor children living with him are completely contradicted by the boyfriend's statements. Overall, the Defendant's history and characteristics overwhelmingly show that no conditions will reasonably assure her appearance.

    4. <u>The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release.</u>

As described above, the alleged offense is serious and involves harm to minor victims, including one who was just 11 years old. Were such conduct to continue, it would pose a serious risk to other minors. Although I hesitate to find clear and convincing evidence showing that the Defendant is a danger to the community (mainly due to the weight of the evidence of her role in the offense), there is nonetheless substantial risk to the community that would be posed by the Defendant's release in light of the allegations against her and the evidence showing that she played at least some role in the egregious activities that occurred.

    5. <u>Conclusion</u>

As described above, the nature and seriousness of the offense, the Defendant's history and characteristics, and the risk posed by the Defendant's release all weigh in favor of granting the Government's motion for pretrial detention. All of those factors show that the Defendant poses a substantial risk of non-appearance. Even the one factor that does not necessarily weigh in favor

of detention (weight of the evidence) still does not weigh against detention, and the evidence is sufficient to establish probable cause.

In reaching the conclusion that there are no conditions that will reasonably assure the Defendant's appearance, I have considered the home detention enforced through electronic monitoring proposed by the Defendant. However, based on the relevant factors and applicable facts, including the seriousness of the offense, the mandatory minimum sentences the Defendant faces, the Government's determination that the advisory guidelines would provide for life in prison, the Defendant's criminal history, the Defendant's mental health, and the Defendant's failure to appear in the past, I cannot be confident that any conditions will be sufficient for this Defendant. Moreover, the Pretrial Services Report and hearing testimony raise serious questions about where the Defendant lives, how long she has lived wherever she lives, and whether there is a home she can live in that is a suitable environment that would provide the necessary stability and supervision to ensure that the Defendant abides by the conditions of any bond. Therefore, I find that there are no conditions or combination of conditions that will reasonably assure the Defendant's appearance.

D.   DISPOSITION

Being fully advised, the Court hereby ORDERS that the Defendant, Shanteria Barnes, be detained prior to trial and until the conclusion thereof.

The Court further ORDERS:

1.   That the Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That the Defendant be afforded reasonable opportunity for private consultation with counsel; and

3. That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the Defendant to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida this 31st day of December 2020.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge

Copies to:

Timothy Day
Attorney for Shanteria Barnes

Brooke Latta
Assistant United States Attorney

United States Marshal
United States Pretrial Services