<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                    FORT LAUDERDALE DIVISION
                    CASE NO.  20-mj-6641-LSS
 3


 4
     UNITED STATES OF AMERICA,
 5
                    Plaintiff,
 6
          vs.
 7
                                        Fort Lauderdale, Florida
 8                                      December 30, 2020
     SHANTERIA BARNES,                  Pages 1-61
 9
                    Defendant.
10   ───────────────────────────────────────────────────────────

11           TRANSCRIPT OF PRETRIAL DETENTION HEARING
               CONDUCTED VIA ZOOM VIDEOCONFERENCING
12          BEFORE THE HONORABLE JARED M. STRAUSS
                 UNITED STATES MAGISTRATE JUDGE
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:
                         United States Attorney's Office
16                       BY:  JESSICA OBENAUF,  A.U.S.A.
                         99 Northeast Fourth Street
17                       Miami,  Florida 33132

18
     FOR THE DEFENDANT:
19                       Federal Public Defender's Office
                         BY:  JUAN MICHELEN, A.F.P.D.
20                       One East Broward Boulevard
                         Suite 1100
21                       Fort Lauderdale, Florida 33301

22
     TRANSCRIBED BY:     DAWN M. SAVINO, R.P.R., C.R.R.
23                       Official Federal Court Stenographer
                         400 N. Miami Avenue, 10S03
24                       Miami, Florida  33128
                         Telephone:  305-523-5598
25
</pre>

```
1                         P-R-O-C-E-E-D-I-N-G-S
2              THE COURT:  Case number 20-6641, United States versus
3      Shanteria Barnes.
4              Will each side please enter your appearance, starting
5      with the Government.
6              MS. OBENAUF:  Good morning, Your Honor.  Jessica
7      Obenauf on behalf of the United States.
8              THE COURT:  Good morning, Ms. Obenauf.
9              MR. MICHELEN:  And good morning, Your Honor.  Juan
10     Michelen, Assistant Federal Defender on behalf of Ms. Barnes,
11     standing in for AFPD Tim Day.
12             THE COURT:  Good morning, Mr. Michelen.
13             Ms. Barnes, can you hear me okay?
14             THE DEFENDANT:  Yeah.
15             THE COURT:  Okay.  What I'm going to do, I'm going to
16     place the cell block on mute just to reduce the background noise
17     on the audio.  Before I do that, let me confirm with you, you're
18     here for your pretrial detention hearing.  We're proceeding by
19     video conference for everyone's safety during the pandemic.  Is
20     it okay with you that we proceed by video conference today?
21             THE DEFENDANT:  Yes, sir.
22             THE COURT:  Okay.  Thank you very much.  Again, I'm
23     going to put the cell block on mute to reduce the noise so that
24     we can all hear more clearly.  If for whatever reason you need
25     to communicate with Mr. Michelen, please just raise your hand
```

3

```
1    and wave and Mr. Michelen, you let me know if I need to unmute

2    her or call the cell block.  Okay?

3          Okay.  We are here, as I said, for a pretrial detention

4    hearing as well as a preliminary examination hearing.  Are the

5    parties ready to proceed?

6          MS. OBENAUF:  The Government is ready.

7          MR. MICHELEN:  Yes, Your Honor.

8          THE COURT:  Okay.  Ms. Obenauf, just as a start, can

9    you tell me what the basis for detention is that the Government

10   is pursuing?

11         MS. OBENAUF:  Yes.  Risk of flight and danger to the

12   community, and there's a presumption as to both.

13         THE COURT:  Okay.  And the presumption is based on 18

14   USC 3142(e)(3) capital E, correct?

15         MS. OBENAUF:  Correct.

16         THE COURT:  What are the maximum penalties and

17   mandatory minimum penalties associated with the charges that

18   have been brought?

19         MS. OBENAUF:  The statutory maximum for both counts is

20   life, and there is a minimum mandatory of 15 years for the count

21   involving Minor Victim One and ten years as to Minor Victim Two.

22         THE COURT:  Okay.  And what is the estimated guideline

23   range that the Government believes the Defendant may face if

24   convicted of the charges?

25         MS. OBENAUF:  Life.
```

**PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING**
**TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY**
**AND COMPUTER-AIDED TRANSCRIPTION**

```
1              THE COURT:  The guideline range is life?

2              MS. OBENAUF:  Yes.

3              THE COURT:  Is the Government going to proceed by

4       proffer?

5              MS. OBENAUF:  Yes.

6              THE COURT:  Okay.  And I see you have a witness, Alex

7       Loff from the FBI for cross-examination; is that correct?

8              MS. OBENAUF:  Correct.

9              THE COURT:  Okay.  Why don't you go ahead and proceed

10      by proffer, Ms. Obenauf.

11             MS. OBENAUF:  Okay.  Thank you.

12             In August of this year, law enforcement made contact

13      with an 11-year-old minor female who I will refer to as Minor

14      Victim One.  Minor Victim One reported that she ran away from

15      her family and went to a hotel in Fort Lauderdale.  While there,

16      she met the Defendant.  The Defendant asked her to dance to see

17      if Minor Victim One knew how to, and when Minor Victim One was

18      able to dance and do a split, the Defendant said she was

19      impressed and told her that she would pay her $60 to strip at a

20      family member's birthday.  The Defendant told Minor Victim One

21      that she gets money from having sex, and showed Minor Victim One

22      videos and pictures of people with wads of cash in order to show

23      Minor Victim One how much money she could make in engaging in

24      commercial sex.

25             Minor Victim One stated that the Defendant arranged
```

1    commercial sex dates for both herself and Minor Victim One.  The

2    Defendant had the dates come to the Defendant's residence so

3    that she could discuss the terms of the date.  On one specific

4    occasion, the Defendant instructed the men which hotel they

5    would be meeting at, told them whether Minor Victim One would be

6    stripping for them and how much it would cost, and when the men

7    arrived at the Defendant's residence, the Defendant drove Minor

8    Victim One in her vehicle with the men following behind in their

9    own vehicle to a nearby hotel in Pompano Beach.  The men rented

10   the hotel rooms.

11        And so during her time with the Defendant, Minor Victim

12   One stated that she shared a room with the Defendant while they

13   engaged in commercial sex acts.  Sometimes Minor Victim One

14   engaged in commercial sex acts in a room by herself.  Minor

15   Victim One stated that the Defendant coordinated meetings for

16   commercial sex at various hotels throughout Broward County, and

17   instructed her on payment not to accept anything less than $40

18   to engage in sexual activities.  Minor Victim One stated that

19   she was with the Defendant engaging in sexual acts for money for

20   about four days, made approximately $150 per day.

21        During -- she was interviewed multiple times.  During

22   one interview, she stated that on one occasion she had about ten

23   dates in one day and during the course of her stay at the hotels

24   with the Defendant, she engaged in approximately 15 to 17 dates.

25   And then in another interview, she said she engaged in

1  approximately 14 dates at the direction and arrangement of the

2  Defendant.

3        I'm using the term "dates" just because that's a common

4  term in trafficking for meetings for the purpose of commercial

5  sex.

6        Minor Victim One stated that she first told the

7  Defendant that she was 17 years old.  She also told the

8  Defendant that she could not be seen in public because she had

9  been reported missing by her family, which was in fact true.

10       Minor Victim One stated that the Defendant used to tell

11 her that Minor Victim One acts like a kid, is always hyper and

12 would often compare her behavior to the Defendant's own

13 12-year-old daughter.

14       During law enforcement's investigation, contact was

15 made with a 15-year-old female who I will refer to as Minor

16 Victim One or -- I'm sorry.  Minor Victim Two.  Minor Victim Two

17 stated that she met the Defendant while Minor Victim Two was at

18 a group home in Pompano Beach and was walking to a nearby corner

19 store.  Minor Victim Two stated that when she met the Defendant,

20 the Defendant told her that she was 19 years old, but then

21 eventually admitted that she was actually 30 years old.

22       And Minor Victim Two stated that when she and the

23 Defendant started spending time together, the Defendant began

24 bringing older men who she believed were in their 40's to the

25 Defendant's residence for dates to engage in commercial sex.

1      On one occasion, the Defendant asked Minor Victim Two

2   and Minor Victim Two's 17-year-old friend, who I will refer to

3   as Minor Victim Three, if they wanted to make $150 doing Minor

4   Victim One's hair in a hotel room in Broward County.  The

5   Defendant drove Minor Victim Two and Minor Victim Three to the

6   hotel in the Defendant's vehicle, and when the girls met Minor

7   Victim One, she told them that she was 17 years old.  She was

8   actually 11 years old.

9      But Minor Victim Two stated that she was with the

10  Defendant on multiple occasions when the Defendant was

11  communicating with a potential commercial sex customer either

12  over the phone or in front of the Defendant's residence, and

13  asked Minor Victim Two if she wanted to make money.  On one

14  occasion, Minor Victim Two asked how, and the Defendant replied

15  making love.  Minor Victim Two told the Defendant no, and the

16  Defendant replied you're going to be broke forever.

17     Minor Victim Two said that the Defendant knew Minor

18  Victim Two's real age and that she and Minor Victim Three were

19  runaways.  Minor Victim Two specifically recalls informing the

20  Defendant that her 15th birthday was soon approaching and that

21  she ran away from her group home.

22     Minor Victim Two went with the Defendant in the

23  Defendant's vehicle to pick up Minor Victim Three from the group

24  home.

25     Minor Victim Two asked the Defendant if she could

8

1   reside with the Defendant for a few days towards the end of July

2   2020, and the Defendant agreed.  A few days into residing with

3   the Defendant, the Defendant began asking for rent money.  Minor

4   Victim Two said that the Defendant was trying to act like her

5   pimp.

6           Minor Victim Two indicated that despite her never

7   asking the Defendant to post online advertisements of Minor

8   Victim Two for commercial sex, the Defendant did so and would

9   repeatedly bring men to the house in an effort to get Minor

10  Victim Two to engage in commercial sex acts.  Every time Minor

11  Victim Two would leave the residence after being set up with a

12  date by the Defendant and would return without money for the

13  Defendant, the Defendant would tell Minor Victim Two that she

14  was bad business.

15          During Minor Victim Two's initial interview, she said

16  that she did not engage in commercial sex acts.  However, during

17  her second interview with law enforcement, Minor Victim Two

18  admitted that she has engaged in commercial sex acts in the

19  past, and that she recalled meeting up with multiple men while

20  living with the Defendant but could not recall if she actually

21  engaged in commercial sex acts with them during that period.

22          As part of the investigation, a search warrant was

23  served on Facebook for the Defendant's Facebook account, and the

24  search warrant return revealed multiple audio messages sent from

25  the Defendant to Minor Victim Two, all of which occurred on

1    August 2, 2020 including the following, and forgive me for my

2    language:  Ho -- one such message read or was the following:

3    Ho, fuck you and your motherfucking business.  Nobody in your

4    business, ho.  You the one wanting my motherfucking licks.  I

5    put your young ass online telling that bitch you 20, ho.

6            And so a "lick" is common terminology in human

7    trafficking for a commercial sex act.

8            Another message was the following:  You not 19, you 15

9    and whatever you owe him you can keep that because you fucking

10   need it.

11           Law enforcement also learned in the search warrant

12   return that on the Defendant's Facebook account, an application

13   for a SKOUT account was installed on June 19, 2019, and that a

14   subpoena was submitted for the SKOUT account, and the return

15   showed that the SKOUT account was accessed from the IP address

16   associated with the Defendant's residence.  A search warrant was

17   submitted to SKOUT, and the returns contained multiple

18   photographs of both the Defendant and Minor Victim Two on the

19   SKOUT account.  Minor Victim Two identified one such photo as

20   her in the Defendant's bedroom at the Defendant's residence.

21           And SKOUT is an application that is often used to set

22   up commercial sex acts with individuals.

23           Law enforcement also located an online advertisement

24   for commercial sex acts posted on July 26, 2020 on another

25   popular website often utilized to advertise for commercial sex.

```
 1    The advertisement was posted on the website from the IP address
 2    associated with the Defendant's residence.  The e-mail address
 3    associated with the advertisement contains the last name and
 4    first name initial of Minor Victim Two.  And then that
 5    advertisement provided a contact number and information
 6    contained from that account, it was a TextNow account number and
 7    so that TextNow account number, the account name belonged to --
 8    had the last name and first initial of Minor Victim Two.  A
 9    search warrant was done on that TextNow number which revealed
10    multiple communications between Minor Victim Two and individuals
11    discussing commercial sex acts.
12         One such communication occurred on July 27, 2020 which
13    was during the time that Minor Victim Two was residing with the
14    Defendant.  During that communication, Minor Victim Two arranged
15    a commercial sex act and advised the individual that the
16    commercial sex act could take place at the Defendant's
17    residence.
18         Law enforcement also interviewed Minor Victim Three who
19    stated that she met the Defendant through Minor Victim Two.
20    Minor Victim Three stated that the Defendant engaged in sex acts
21    for money.  She also called them licks.  The Defendant told
22    Minor Victim Three that she gave Minor Victim Two like three of
23    my licks.
24         Minor Victim Two showed Minor Victim Three various
25    cellphone apps that Minor Victim Two would use to engage in
```

1   dates for herself and the Defendant, and on one occasion while

2   Minor Victim Two and Minor Victim Three were in the car with the

3   Defendant, Minor Victim Two told Minor Victim Three that she

4   needed money to give to the Defendant to pay rent.  To do so,

5   Minor Victim Two called a lick who picked her up from the

6   Defendant's residence.

7          On a separate occasion, Minor Victim Three recounted a

8   story when they were on the way to a hotel in Fort Lauderdale

9   when she was in the back seat of a car with the Defendant.

10  While two men were in the front seat, the Defendant told Minor

11  Victim Three if we get nasty for them, they'll pay us good and

12  attempted to kiss Minor Victim Three.  Minor Victim Three told

13  the Defendant no, and advised that the Defendant was so angry

14  from this that the Defendant went to the group home the

15  following day and cursed out Minor Victim Three in front of

16  other girls.

17         During law enforcement's interviews with Minor Victim

18  One, she reported that the Defendant always had a firearm with

19  her.  She described it as an old cowboy gun, and during the

20  search warrant execution at the Defendant's house, in the room

21  that she was renting, under one of the beds, law enforcement

22  found two firearms, one of which was an older model revolver.

23         And then post-arrest during a post-Miranda interview,

24  the law enforcement asked the Defendant about her conduct.  As

25  for her involvement with Minor Victim One, she said that her

```
 1   ex-boyfriend called her to come to a hotel and that when she
 2   arrived, Minor Victim One was there naked in a hotel room.  She
 3   denied having any involvement with the minor -- the Minor Victim
 4   One engaging in commercial sex. She said that her ex-boyfriend
 5   asked the Defendant to help with getting the victim's hair done
 6   and get clothes, and that during her time with Minor Victim One,
 7   she did admit to talking to her about being responsible with her
 8   money, but had nothing to do with her commercial sex activity.
 9   The Defendant said that she believed that Minor Victim One was
10   12 or 13 years old, and she said that she knew that Minor Victim
11   One had sex with her ex-boyfriend and his friends, but that she
12   was not involved in any way.
13         As for Minor Victim Three, she denied asking her to
14   engage in commercial sex acts.
15         And as to Minor Victim Two, the Defendant said that she
16   believed that she was 14 or 15 years old.  She at first said
17   that she didn't really talk much with Minor Victim Two.  She
18   minimized and denied her involvement.  And then during the
19   interview, law enforcement confronted her with the recordings
20   obtained from Facebook.  She first stated that the recordings
21   dealt with her helping Minor Victim Two date a boy that she
22   liked, but ultimately she admitted that during her involvement
23   with Minor Victim Two, she asked to stay with the Defendant and
24   that the Defendant's stepdad, who also lived in the residence,
25   told Minor Victim Two that she needed to pay rent.  And then at
```

1    some point, the Defendant found out that Minor Victim Two was

2    making money from engaging in commercial sex by taking the

3    Defendant's commercial sex customers but not giving them money

4    for rent, and that was actually what preceded the recordings.

5         And that concludes the Government's proffer.

6         THE COURT:  Ms. Obenauf, can you just go through that

7    last bit regarding the post-arrest statements regarding Minor

8    Victim Two.  You indicated that the Defendant stated that her

9    stepfather -- the Defendant's stepfather was the one that asked

10   Minor Victim Two to pay rent and then that the -- I think I

11   missed the last bit about what the Defendant said after that.

12        MS. OBENAUF:  Sure.  So Minor Victim Two says that the

13   Defendant was the one who asked her for rent money and then

14   during -- but during their interview with the Defendant, she

15   said that it was in fact -- it was her stepdad who we think may

16   be the ex-boyfriend of the Defendant's mother, but I'm not quite

17   sure.  But he was also residing in the residence.  And the Agent

18   can elaborate more on this, but there's some -- there's evidence

19   that he was also involved in, you know, having girls at the

20   house for commercial sex acts.  So there's lots of commercial

21   sex activity happening in the house.

22        But the Defendant said that Minor Victim Two asked to

23   stay with her, and that the Defendant's stepfather told Minor

24   Victim Two that she needed to pay rent.  And then at some point

25   the Defendant found out that Minor Victim Two was making money

```
1     from engaging in commercial sex by taking the Defendant's
2     commercial sex customers, but was not turning over any of the
3     money for rent.
4               THE COURT:  I think I've got the proffer now.
5               MS. OBENAUF:  Okay.
6               THE COURT:  Anything else that the Government would
7     like to proffer before cross-examination?
8               MS. OBENAUF:  No, Your Honor.  Just information,
9     argument based on the Pretrial Services Report.  But we can
10    reserve.
11              THE COURT:  Yes.  And we'll make sure to address that
12    after cross-examination of the Agent.
13              Mr. Michelen, would you like to cross-examine Agent
14    Loff?
15              MR. MICHELEN:  Yes, Your Honor please.
16              THE COURT:  Agent Loff, please raise your right hand.
17    Do you solemnly swear or affirm that the testimony you're about
18    to give will be the truth, the whole truth and nothing but the
19    truth?
20              THE WITNESS:  I do.
21              THE COURT:  You heard the proffer that Ms. Obenauf just
22    recited.
23              THE WITNESS:  Yes, Your Honor.
24              THE COURT:  Okay.  Do you adopt that proffer as your
25    direct testimony?
```

```
 1                 THE WITNESS:  I do.

 2                 THE COURT:  Do you have any corrections or deletions to

 3      that proffer?

 4                 THE WITNESS:  No, sir.

 5                 THE COURT:  Okay.  Mr. Michelen, you may inquire.

 6                           CROSS-EXAMINATION

 7      BY MR. MICHELEN:

 8      Q.  Thanks, Your Honor.

 9                 Special Agent, good morning.  I guess first if we can

10      start with how did you get involved in this case?

11      A.  So before we start, can you hear me fine?

12      Q.  Yes.

13      A.  Yes?  Okay.  I was called out one night and I can't tell you

14      the approximate date, but to interview Minor Victim One.

15      Q.  Okay.  And are you the lead case agent in the case?

16      A.  Yes, sir.

17      Q.  So this became your case once you interviewed the victim?

18      A.  Yes, sir.

19      Q.  And the initial information you got obviously was from Minor

20      Victim One?

21      A.  Yes, sir.

22      Q.  So I guess I want to start off, maybe the top of the

23      criminal complaint you drafted.  You mentioned an Oakland Days

24      Inn Hotel.  Is that the only hotel that you're aware of that has

25      anything to do with this case?
```

1   A.   I believe there's another hotel in Pompano, a Travelodge,

2   but it's a little unclear still.

3   Q.   And your investigations led you to believe that what that --

4   these hotels, that's where some of the sex acts occurred?

5   A.   Correct.

6   Q.   And has your investigation led you to any evidence, for

7   example, one that Ms. Barnes was ever at the Oakland Days Inn

8   Hotel?

9   A.   Just evidence from direct statements from the victims as

10   well as from the Defendant.

11   Q.   So in terms of from the actual hotel, do you have any, like,

12   video or any receipts or any logs showing that Ms. Barnes ever

13   checked in at the hotel, the Oakland Days Inn Hotel?

14   A.   Correct.  So the surveillance video did not go that far

15   back, and the hotel registration was made in her ex-boyfriend's

16   name which is consistent with what the Minors and the Defendant

17   had said.

18   Q.   So just to be clear, you're saying that you did find

19   registrations under the ex-boyfriend's name.

20   A.   Yes, sir.

21   Q.   And what is the ex-boyfriend's name?

22   A.   I'm not sure as to pronunciation, but it's Cleon Kirlew.

23   Q.   Kirlew?

24   A.   Yes, sir.  I believe it's K-I-R-L-E-W.

25   Q.   Do you know the dates of when Cleon Kirlew stayed at the

```
 1    hotel?
 2              MS. OBENAUF:  Objection as to relevance.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  I don't have the exact dates, but it was
 5    end of July, early August.  It was for approximately two to
 6    three nights.
 7          BY MR. MICHELEN:
 8    Q.  Two to three nights.  Okay.  That was my next question.  You
 9    also mentioned that during her interview, Ms. Barnes' interview,
10    she stated she had stayed at the Oakland Days Inn Hotel; is that
11    what you said?
12    A.  I don't know if she stayed there, but that's where she
13    stated she met Minor Victim One.
14    Q.  Okay.  And this interview of Ms. Barnes happened upon her
15    arrest?
16    A.  Yes, sir.
17    Q.  And was it recorded?
18    A.  Yes, sir.  Audio and video.
19    Q.  Perfect.  As far as you're aware, sticking -- I guess we can
20    stick with the Oakland Days Inn Hotel, was it just that two to
21    three day period that you're aware of, or were there multiple
22    stays under either Cleon Kirlew's name or anyone else that you
23    think is associated with this?
24    A.  So I was told by the victim that any subsequent commercial
25    sex acts would be the rooms were reserved by the johns or the
```

1    customers.  So there were no registrations under the Defendant's

2    name.

3    Q.  Okay.  And according to Minor Victim One, these dates at the

4    hotels were at the Oakland days in hotel, same hotel?

5    A.  Either that hotel or a nearby hotel in Pompano which I

6    believe to be Travelodge.

7    Q.  And were you able to, I guess, corroborate maybe any of the

8    dates Minor Victim One had given you with any johns registering

9    at the hotel during those days?

10   A.  Unfortunately I don't have any information on the johns to

11   follow-up on this time.

12   Q.  Okay.  Starting with -- I guess we can just go in order,

13   Minor Victim One.  Aside from Minor Victim One -- my

14   understanding based on the complaint and the proffer is that

15   Minor Victim One alleges that Ms. Barnes set updates for her,

16   right?

17   A.  Yes, sir.

18   Q.  Aside from that, is there -- does the FBI have any evidence

19   that corroborates that she set up dates, for example, postings

20   online, things like that?

21   A.  No postings for Minor Victim One.

22   Q.  No postings for Minor Victim One.  At any point -- I saw

23   there were a few subpoenas for Facebook and for the SKOUT app

24   and for the TextNow, but that's associated with Minor Victim

25   Two.  In terms of Ms. Barnes' phone, for example, does the FBI

1   have that?

2   A.   Yes, sir.

3   Q.   And in the phone is there any evidence, again just starting

4   with Minor Victim One, is there any evidence that Ms. Barnes set

5   up, quote, unquote dates, commercial sex acts, whatever you want

6   to call it, for Minor Victim One?

7   A.   So complete examination of the phone is still being done in

8   terms of a preliminary one.  No concrete dates for Minor Victim

9   One yet, but many conversations with licks occurring so it's

10   still trying to determine that.

11   Q.   And in your interviews of Minor Victim One, did she explain

12   how she believed that Ms. Barnes was setting up these dates for

13   her?

14   A.   So all Minor Victim One stated is that she was always on her

15   phone and she would either call or text message prior to a date

16   arriving.  And when speaking with the Defendant, she said that

17   many of the -- and I call them licks just as that was the

18   language being used, that she would find licks walking down the

19   street in her neighborhood or in the store and then communicate

20   with them.

21   Q.   So in -- well, sorry.  Let me back up.  Minor Victim One, do

22   you have any cellphone belonging to her that the FBI is

23   analyzing?

24   A.   She did not have a phone.

25   Q.   So what is your understanding of how Minor Victim One and

1    Ms. Barnes communicated?

2    A.   I believe it's only face-to-face.

3    Q.   Okay.  So I'm trying to understand.  What is your

4    understanding of how, for example, Ms. Barnes knew where to go

5    talk to Minor Victim One?  Where was Minor Victim One during

6    this time period where she was missing from home?

7    A.   So Minor Victim One was with the Defendant's ex-boyfriend at

8    the Days Inn which is where they met.  It's still a little

9    unclear as to the time line and sequence of events from the

10   Defendant, but when the Defendant showed up to the hotel, Minor

11   Victim One was naked.  She was asked by her ex-boyfriend to help

12   with her hair.  She drove her around and again, the order was

13   unclear, but to a store to get hair products, to her house to

14   get clothes, she returned her to the hotel.  At some point later

15   the Minor Victim One came back to her house to finish getting

16   her hair done, and then eventually Minor Victim One states she

17   was scared, she was making excuses to go home, to get more

18   clothes.  She explained she finally convinced the Defendant to

19   drop her off and told the Defendant she lived down the street so

20   she wouldn't know her exact address.  When she was dropped off,

21   she left and went home.  The Defendant stated that she asked to

22   go home and I brought her home, so I believe when they

23   communicated it was -- they were next to each other.  They were

24   in close proximity.

25   Q.   Okay.  So back to Cleon Kirlew.  Has he been arrested?

1    A.   So his name was not made known and in fact, the Defendant

2    was unclear of his full name.  But we learned of his true

3    identity from her interview.  So the investigation is still

4    continuing for him.

5    Q.   Okay.  And what makes you think that this is Ms. Barnes'

6    ex-boyfriend?

7    A.   Her statement.

8    Q.   Okay.  And in terms of, I guess, the initial interview with

9    Minor Victim One, how was she able to identify Ms. Barnes, I

10   guess, because I'm reading here she knew her as Pumpkin.  So

11   what it is that happened that you were able to zero in on Ms.

12   Barnes?

13   A.   Sure.  So she said her name was Pumpkin.  She lived on 2nd

14   Street in Pompano.  Very close chronologically, Minor Victim Two

15   disclosed that she was being trafficked by a girl that went by

16   Pumpkin whose real name is Shanteria Barnes living at the

17   address.  And then when we went back to Minor Victim One with

18   the photograph and Facebook and all that, she identified her as

19   pumpkin.

20   Q.   Gotcha.  Okay.  There's a mention of a vehicle, like a

21   silver two-door car or four door, I don't know if it said two

22   door, and then I think one of the other victims calls it a

23   Toyota.  As far as you're aware, are there any vehicles

24   registered under Ms. Barnes' name?

25   A.   There are not.  I do know that she had -- I don't know

1   exactly, but she had, I think it was a silver vehicle but she

2   got in an accident with it and it was totaled.  So I don't

3   believe -- I don't know of any car that she currently has.

4   Q.  So what leads you to believe that she had a silver vehicle

5   that she got into an accident with?

6   A.  So she had a statement, there were multiple messages on

7   Facebook, I think she even had a picture of her face being

8   bruised.  Minor Victim Three was in the car at the time and

9   there was a picture of her arm that was bleeding.  So the

10  information came from a few places.

11  Q.  Gotcha.  I'm now specifically -- I'm thinking of -- well,

12  I'm looking at Paragraph 25 where, I guess from Ms. Barnes'

13  Facebook account, you got the search warrants returned.  One of

14  the statements, Statement 25 B, there's a reference to a "he"

15  and to a "him".  What is your understanding of who they're

16  referring to there?

17  A.  I asked the Defendant that.  Honestly, it's still very

18  unclear.  It was someone that the Defendant was with at the time

19  because there are other messages discussing, I presume, a same

20  "he".  I really couldn't give you an exact answer.

21  Q.  Okay.  Paragraph 27 mentions the IP address and that it came

22  back to an address that you associate with Ms. Barnes.  What

23  address is that?

24  A.  That is the 3008 Northwest 2nd.

25  Q.  And why do you associate that with her?

1    A.  Well, definitely Minor Victim One and Two said that's where

2    they were at.  She makes multiple references to it in her

3    Facebook, in the Defendant's Facebook.  And in her interview

4    when asked where she resides, she gave that address as her

5    residence.

6    Q.  Okay.  In terms of -- I'm going back a little bit.  In terms

7    of setting up of the commercial sex acts, Minor Victim -- and

8    I'm just paraphrasing, but if I'm wrong, please correct me.

9    Minor Victim One, so far the FBI does not have any evidence that

10   Ms. Barnes solicited or set up commercial sex acts, dates, for

11   Minor Victim One.  Is that accurate?

12   A.  Right now.

13   Q.  Aside from obviously Minor Victim One's statement?

14   A.  I have no text messages or online advertisements for Minor

15   Victim One.

16   Q.  Okay.  Did Minor Victim One mention anything about the guy

17   at the Oakland Days Inn Hotel, what his role in this was?

18   A.  You're referring to the ex-boyfriend who rented the room?

19   Q.  Right.  Yes.  Which is the person who she was staying with,

20   right?  At least for some portion of the time.

21   A.  Correct.  So Minor Victim One stated that she met someone by

22   the name of Nick who said that she could be making money if --

23   and doing it safe with one of his friends.  He introduced her to

24   Moe, who she knew as Moe, who is the ex-boyfriend and Moe

25   introduced her to Pumpkin.  So she wasn't very clear on any sort

24

1   of relationship structure, like any hierarchy or anything, she

2   just said he introduced me to her.

3   Q.  Did she distinguish in terms of, I guess, whether Moe or

4   Nick were ever the ones setting up these dates?

5   A.  She did not believe they were.

6   Q.  Okay.  So now moving on to Minor Victim Two.  During the

7   proffer there was a mention that some of the commercial sex acts

8   that were posted and I -- correct me if I'm wrong, they led back

9   to an e-mail associated with Minor Victim Two's last name and

10  Minor Victim Two's phone number; is that correct?

11  A.  Yes, sir.  Do you want me to elaborate there or --

12  Q.  Yes, please.

13  A.  Okay.  So there is a website commonly known for prostitution

14  advertisements.  The IP address for one advertisement was found

15  to be posted from the Defendant's address.  The account that

16  posted that advertisement contains the last name and first

17  initial of Minor Victim Two.  That advertisement had a TextNow

18  phone number associated with the advertisement.  That account

19  was also in the same e-mail address which has the last name and

20  first initial of Minor Victim Two.

21  Q.  Okay.  So --

22  A.  Did that help at all?

23  Q.  Well, yeah.  I'm trying to understand the connection in

24  terms of it seems like Minor Victim Two posted these herself.

25  What is the connection to Ms. Barnes or why do you believe --

1    let me rephrase that.

2           Why do you believe that Ms. Barnes had anything to do

3    with any dates that Minor Victim Two may or may not have posted

4    or gone on or what have you?

5    A.   Sure.  So they were posted.  Well, that advertisement was

6    posted from Ms. Barnes' residence and the messages contained

7    within the TextNow account, most of which discuss setting up

8    dates.  Her address is given out multiple times as a meeting

9    location in which the commercial sex act can occur.

10   Q.   As far as Minor Victim Two, does the FBI have any evidence

11   that Ms. Barnes forced, coerced, obligated, whatever word you

12   want to use Minor Victim Two, to engage in any commercial sex

13   acts or post any commercial sex act, date, solicitation or

14   anything like that?

15   A.   No.  No force or coercion that I can think of.  Just that

16   she would continuously ask for rent money.

17   Q.   And is that according to text messages or is that according

18   to Minor Victim Two?

19   A.   So both.  There is a Facebook message in which she states

20   something to the effect of Vincent, who is the stepdad, wants

21   his rent money.

22   Q.   Okay.  In the interview of Minor Victim Two, did she ever

23   say that Ms. Barnes forced her to engage in sex acts, anything

24   like that?

25   A.   No.  She just said that she repeatedly told her she didn't

1    want to, but that guys would continue to show up at the house

2    and she would ask her do you want to make money.

3    Q.  And does Minor Victim Two, and I guess for that matter Minor

4    Victim Three, do either of them mention, I guess, Moe and Nick

5    or Cleo, Cleon.  Do they mention them too?

6    A.  Yes, sir.  So Minor Victim Two and Three went to the Days

7    Inn to do Minor Victim One's hair, kind of in a weird

8    occurrence, but they don't know Minor Victim One; Minor Victim

9    One doesn't know Minor Victim Two or Three.  So they were all at

10   the hotel at the same time, the room rented by Cleon who they

11   all know as Moe, but that was the only information given by all

12   of them.  Just that and a description, a physical description.

13   Q.  And in terms of Minor Victim Two and Three's statements, how

14   did they describe the relationship or the actions of Cleon and

15   Nick?  How do they describe what they were doing in all this,

16   what their involvement is?

17   A.  So both Minor Victim Two and Three give a fairly similar

18   statement.  They say that they were asked by the Defendant to go

19   to the hotel to do a girl's hair.  They said that when they

20   showed up, there were men in the room, one of which was --

21   they're referring to him, they all know him as Moe, so they said

22   Moe was there.  And it's unclear how many other men, but there

23   were multiple men in the room and that they were making advances

24   to both Minor Victim Two and Minor Victim Three, so much so that

25   they felt uncomfortable and they asked someone to come pick them

1    up and take them away from the hotel, which is why her hair

2    didn't get finished, Minor Victim One's hair.

3    Q.   Okay.  Was Ms. Barnes -- is it your understanding that Ms.

4    Barnes was in the hotel room during the hair braiding situation?

5    A.   So I know -- let me rephrase this.  I was told she dropped

6    them off.  I don't know how long she was there.  I mean, she

7    states that she met Minor Victim One there.  She told us that

8    she was around when all three were there to do hair, but I don't

9    know if she's in the hotel room the whole time, came and gone,

10   I'm not sure.

11   Q.   Okay.  And I know I already asked you about Cleon a/k/a Moe.

12   How about Nick?  Have you interviewed him, arrested him,

13   investigating him?

14   A.   I have no more information on him than I did when I started.

15   Q.   Okay.  I mean, I suspect you guys are investigating him?

16   A.   I mean, if he's involved, yes.  It will -- right now, my

17   focus is on Cleon and we can see what he has to say about Nick

18   or what that uncovers about Nick.

19   Q.   And is it your -- based on your investigation, is it your

20   belief that Cleon is kind of like a pimp, a leader of this ring,

21   whatever you want to call it?  I mean, is he the head guy?

22   A.   All I know is that he's involved.  I don't know to the

23   extent at this time.  I just learned of his name, I think it was

24   last week.

25   Q.   Okay.  Have you uncovered any evidence -- let me back up.  I

1    know you mentioned the website that the Minor Victim Two's, I

2    guess, posting was made on.  What website was that?

3    A.  So that was MegaPersonals.

4    Q.  MegaPersonals?

5    A.  Yes sir, which is a common website used in this area for

6    soliciting commercial sex acts.

7    Q.  And so far to date, have you uncovered any evidence of Ms.

8    Barnes posting any solicitations -- any commercial sex act or

9    date solicitations on either MegaPersonals or any other website,

10   either -- for anyone?  Whether it's for the minors or not, for

11   anyone?

12   A.  So recovered from the search warrant done on the Defendant's

13   Facebook, it showed that an account was downloaded called SKOUT

14   which is another app and website, but mostly used as an app

15   which is commonly used to solicit commercial sex acts.

16   Subsequently a search warrant was issued for that account.  It

17   was registered to an e-mail that is Shanteriabarnes93@gmail.com.

18   It was created from the IP address at her residence, and it had

19   profile photographs of the Defendant and of Minor Victim Two,

20   one of which was taken -- one of the photographs of Minor Victim

21   Two which was taken in her room at the residence.  So I believe

22   that to be another advertisement.

23        There were limited messages recovered from SKOUT.

24   SKOUT routinely purges their data if it's used for prostitution,

25   so I don't think we recovered the profile, so to speak, or many

1    of the messages.  But the TextNow account used by Minor Victim

2    Two, there are many verification codes from SKOUT, so I don't

3    know if that app -- well, I can say that app was being used by

4    TextNow.  I don't know if it was that profile, but I believe

5    that profile was soliciting sex for either the Defendant and

6    Minor Victim Two or a combination thereof.

7    Q.   Okay.  But just to be clear, and admittedly I don't know

8    much about the SKOUT app at all, but are you saying that these

9    were posted through Minor Victim Two's TextNow account?

10   A.   No.  No.  They were posted -- they were created by an e-mail

11   in the Defendant's full name from the IP address that the

12   Defendant lives at.

13   Q.   Sorry.  Go ahead.

14   A.   I was just going to say, that's the only information I can

15   say as to their creation.

16   Q.   And just to be clear, so when you get the subpoena back from

17   SKOUT app, you find pictures of Minor Victim Two and of Ms.

18   Barnes, but do you know if those pictures were posted at any

19   point or can you tell if that SKOUT app posted commercial sex

20   act solicitations.

21   A.   So the search warrant revealed those profile photos.  That

22   app will not tell you when each photograph was posted.  It's

23   intended for like a meet-up dating site which is why they

24   systemically try to go through and purge out any prostitution

25   advertisements, so it has limited data in terms of, you know,

1    that type of stuff.  But those are profiles, profile photos for

2    that profile.  Photographs of those -- the Defendant and of

3    Minor Victim Two.

4    Q.  And as far as you're aware, did Minor Victim Two or any of

5    the other victims for that matter have a SKOUT app account?

6    A.  So Minor Victim Two has had SKOUT accounts in the past.  I

7    haven't -- I don't know if she had nor have I located any around

8    that same time that -- you know, or with photos of the Defendant

9    like that advertisement had.

10   Q.  Got it.  And Agent, lastly, just to confirm, Minor Victim

11   Three, there are no allegations that Ms. Barnes ever forced

12   Minor Victim Three to engage in any kind of sex act; is that

13   accurate?

14   A.  Yes.  Just that she attempted to and she said no.

15   Q.  Okay.

16        MR. MICHELEN:  Agent, I have no further questions.

17   Your Honor, thank you, I appreciate it.  Thank you, Agent.

18        THE COURT:  Before -- Ms. Obenauf, before you ask any

19   redirect questions, I'd like to ask Special Agent Loff a couple

20   of questions.

21        The residence, can you give again the address of the

22   residence that Minor Victim Two and Three identified as the

23   Defendant's residence?

24        THE WITNESS:  Yes, sir.  It's 3008 Northwest 2nd

25   Street, Pompano Beach.  And Minor Victim One also identified

1      that as her residence.

2            THE COURT:  Okay.  And is that where the FBI executed a

3      physical search warrant?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Okay.  And based on -- can you tell me what

6      is the evidence that you've collected, either through the

7      statements or the search warrant, as to anyone else who is

8      living there other than the Defendant?

9            THE WITNESS:  I'm sorry.  Could you repeat the

10     question, Your Honor?

11           THE COURT:  Sure.  Do you have any evidence of whether

12     anyone was living there other than the Defendant?

13           THE WITNESS:  Oh, yes.  Yes.  So prior to executing the

14     search warrant, I was told by multiple victims that her -- it

15     was unclear as to the relationship, but that her stepdad or dad

16     lived at the residence.  Minor Victim Two said that her stepdad

17     lives there.  His dad lived there.  Another female lived there

18     and Minor Victim Two stated that there were, to use her words,

19     multiple prostitutes that lived in the tool shed behind the

20     house.  So at the time of the search warrant execution, there

21     were seven people at the house.

22           THE COURT:  One second.  There were seven people at the

23     house when it was ex -- when the search warrant was executed?

24     And who were those the people that were there?

25           THE WITNESS:  So I'm still waiting for all the reports

1    to be given back as this was done recently, but what I was

2    relayed was that it was stepdad, his father.

3                THE COURT:  Okay.

4                THE WITNESS:  The girl that rented, who went by Toya.

5    There was a minor victim there, or -- I'm sorry.  Not a minor

6    victim.  A minor there who we believe is like the niece of Toya.

7    Her mother ended up coming to pick her up, but she was there.

8    There was stepdad's girlfriend, and then were, I think it was

9    two girls that lived in the shed in the back as well as one of

10   their boyfriends.

11               THE COURT:  Okay.  Did the Defendant say anything about

12   who she lived with or where she lived?

13               THE WITNESS:  Yes.  She stated that she rented a room

14   from her stepdad.  She stated that she shared that room with him

15   and that he had, in her words, multiple prostitutes living in

16   the tool shed behind the house.

17               THE COURT:  I want to also just clarify, did --

18   regarding the advertisements that either show or mention Minor

19   Victim Two, did Minor Victim Two say anything to indicate that

20   the Defendant either posted those advertisements for her or

21   encouraged her to post those or did she post them herself?  I'm

22   a little unclear as to who is actually posting those

23   advertisements.

24               THE WITNESS:  So Minor Victim Two, it is a little

25   unclear, but she stated -- in one interview she stated that she

1    did not want to do any prostitution dates.  She told the

2    Defendant that.  Despite that, the Defendant posted her online.

3    So that there is one statement where she said that.

4         There's another where she said again, she didn't want

5    to do any dates, but she was told to pay rent money.  I don't

6    know then if she posted the advertisement.  I can say that the

7    one on MegaPersonals were posted in her e-mail, so I don't know

8    if she posted that one or not.  But I can say it was posted from

9    that residence.

10        THE COURT:  Okay.  Ms. Obenauf, I want to give you an

11   opportunity for redirect.  Thanks for indulging my questions.

12        MS. OBENAUF:  Sure.  Thank you.

13                     REDIRECT EXAMINATION

14   BY MS. OBENAUF:

15   Q.  So Special Agent Loff, do you have the complaint in front of

16   you?

17   A.  Yes, ma'am.

18   Q.  Can you look at Paragraph 21?

19   A.  Okay.

20   Q.  In the last line it says Minor Victim Two believes that

21   Barnes got Minor Victim Two's pictures from her Instagram

22   account.  Can you tell us about what that is in reference?

23   A.  Yes.  So Minor Victim Two stated that the Defendant would

24   come to her and say someone's here, wants to meet you, in

25   various contexts, but saying that hey, he saw you and wants to

1    have a -- you know, have a date with you.  So we asked how did

2    -- we asked the Minor Victim Two how did he see you?  And she

3    said I think maybe the Defendant showed her a picture of me.  To

4    which we asked, did she take pictures of you?  And she said no,

5    I think she got them from Instagram.

6    Q.  Okay.  And -- one second.  While I'm looking for that, so --

7    okay.  So then Paragraph 23 where it says that a few days

8    residing with Barnes, Barnes began asking for rent money and she

9    was trying to act like her pimp, this next line, Minor Victim

10   Two indicated that despite her never asking Barnes to post

11   online advertisements, Barnes did so and would repeatedly bring

12   men to the house in an effort to get Minor Victim Two to engage

13   in commercial sex acts.

14        So is she saying that they had a conversation about

15   Barnes posting her online?

16   A.  All she -- I don't know if they had a conversation or not,

17   but she believed that there was an advertisement that was posted

18   by the Defendant.  I don't know how she came to that conclusion,

19   but she believed there to be.

20   Q.  Okay.  And then we have the advertisement that was posted

21   from her IP address on MegaPersonals, and then the installation

22   of the SKOUT account app on the Defendant's Facebook, right?

23   A.  Correct.  With her e-mail address as the creation e-mail.

24   Q.  And *(audio distortion)* picture?

25   A.  I'm sorry.  Can you repeat that?

```
1    Q.   And Minor Victim Two's picture on the SKOUT account?

2    A.   Correct, as well as the Defendant's.  And I believe there

3    was one photograph of the Defendant's cousin, one male who I

4    didn't know and when I asked the Defendant, she said that's my

5    cousin.

6    Q.   Okay.  And then how long did she say that she had been with

7    her new boyfriend?

8    A.   She told me approximately five days.

9    Q.   From the time of your interview?

10   A.   Correct.

11   Q.   When was that?

12   A.   The interview?

13   Q.   Yeah.

14   A.   It occurred on Friday the 18th of this month.  December

15   18th.

16   Q.   Okay.  And did she give you her boyfriend's name?

17   A.   I believe she did.

18   Q.   Okay.  Did AUSA Brooke Latta provide you with the name

19   Tavarus Birch?

20   A.   Yes.

21   Q.   Did you run his NCIC?

22   A.   I did.  Yes, ma'am.

23   Q.   And what did you -- what were you able to determine about

24   whether or not he's a convicted felon?

25   A.   He is.
```

**PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING**
**TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY**
**AND COMPUTER-AIDED TRANSCRIPTION**

```
1    Q.  Okay.  Did the NCIC tell you how many felony convictions and
2    what types of charges he's been arrested for in the past?
3    A.  It did.  It said that there were four felony convictions.
4    Q.  And do you remember any of the charges that he had been
5    arrested for in the past?
6    A.  I don't recall.  I can look through, if you would like,
7    quickly.
8    Q.  Okay.
9    A.  But I don't recall off the top of my head.
10       MS. OBENAUF:  So if the Court is interested, we can
11   certainly do that.  But as far as my redirect, that's all I
12   have.
13       THE COURT:  One moment, please.  Okay.  Special Agent
14   Loff, you can step down.
15       THE WITNESS:  Thank you, Your Honor.
16       THE COURT:  Mr. Obenauf, is there any other evidence
17   that the Government wants to present?  I'll give you an
18   opportunity for argument once the Defense has presented their
19   evidence, but is there any other evidence the Government is
20   going to present?
21       MS. OBENAUF:  No, Your Honor.
22       THE COURT:  Okay.  Mr. Michelen, is there any evidence
23   that the Defendant would like to present?
24       MR. MICHELEN:  No, Judge.  Thank you.  Just arguments
25   whenever the Court is ready.
```

```
1        THE COURT:  Before I turn to arguments, Mr. Michelen,

2   does the Defendant have any corrections to the Pretrial Services

3   Report?

4        MR. MICHELEN:  Your Honor, as of right now we do not.

5   But if there are, I will surely let you know.  I will let the

6   Court know.

7        THE COURT:  All right.  Then I'm going to take judicial

8   notice of the Pretrial Services Report then.

9        Let me turn to the Government for their argument.

10       MS. OBENAUF:  Thank you.  So as far as detention is

11   concerned, the nature and circumstances of the offense are

12   serious.  The evidence has shown that a 30-year-old woman

13   recruited these minor victims, two of them out of a group home,

14   one of them who was a runaway and 11 years old during a very

15   vulnerable time.  The victims reported that the Defendant set up

16   dates, instructed the men, you know, where to go, taught them

17   about, you know, payment, and I'm speaking specifically about

18   Minor Victim One.

19       And I want -- I think it's important to note that Minor

20   Victim One did not know Minor Victims Two and Three.  Minor

21   Victims Two and Three came out of the same group home, Minor

22   Victim One ran away from home, and the only time they met was in

23   that passing encounter inside of a hotel room.

24       The evidence is the testimony of three minor victims

25   and the corroboration from the communications through the
```

1    TextNow account showing the negotiations for commercial sex
2    acts, that the sex acts concurred at the Defendant's residence;
3    that there was a SKOUT account installed on the Defendant's
4    Facebook account with the Minor Victim Two's photograph, and the
5    audio recordings where the Defendant is admitting to Minor
6    Victim Two something to the effect of I put your young ass
7    online, and talking about her young age and licks, which we know
8    are commercial sex acts.  The Defendant admitted to knowing the
9    ages of the victims.  I mean, she said 12 to 13 as to Victim
10   One, but it doesn't matter, she's still a minor.
11           And I just want to point out that it doesn't -- let's
12   just say hypothetically that the Defendant was allowing Minor
13   Victim Two to reside in her home while she knew that she was
14   posting herself online and engaging in commercial sex acts with
15   men.  She's still guilty of sex trafficking.  For minor victims,
16   the Government does not have to prove that there is any sort of
17   force, fraud or coercion, or that the victims even actually in
18   fact engaged in commercial sex acts, but that she did certain
19   things such as transported, recruited, enticed, harbored,
20   maintained, knowing or basically having reason to know that they
21   would be caused to engage in commercial sex acts, not that they,
22   in fact, were engaged in commercial sex acts.  So it is
23   sufficient that we have concrete evidence of text messages
24   between the -- between the Minor Victim Two and different
25   potential customers setting up dates.  Whether she got in the

1    car and never actually engaged in the commercial sex act, it

2    doesn't matter.  But the Defendant knew that she was residing in

3    her house and that this was going on, and that is evident based

4    on her audio messages to her and the other evidence.  But it's

5    not -- that's not what this case is.  We have three victims.

6         THE COURT:  Well, hold on, Ms. Obenauf.  I'm sorry to

7    interrupt you.  I just want to make sure that I understand

8    though.  Is the theory -- is the Government's theory as to Minor

9    Victim Two that by allowing Minor Victim Two to remain in the

10   home and by offering her the opportunity or encouraging her to

11   engage in the commercial sex acts, that that would be sufficient

12   to violate the statute?

13        MS. OBENAUF:  Yes.  But that's not the Government's

14   theory.  I guess my point is is if that's the defense's

15   argument, that that is still sufficient to violate the statute.

16   The evidence based on what Minor Victim Two is saying, which is

17   corroborated by the other two victims, and basically in

18   establishing her M.O., is that she repeatedly recruited her, she

19   enticed her, she harbored her.  She provided her in the form of

20   bringing men to the house and knowing that she would be caused

21   to engage in a commercial sex act and that she was a minor.

22        As for Minor Victim One, I understand the Defense's

23   point that we do not have the hotel records or video or anything

24   like that, but the evidence is Minor Victim One's statement

25   which is credible because it is corroborated by the other two

1    victims who did not know her.  And so then corroborated by the

2    independent evidence from the electronics as far as the SKOUT,

3    the MegaPersonals that this is -- we have established that this

4    is what she was doing.  She was operating a scheme to recruit

5    and entice vulnerable, young girls, to introduce them to the

6    business.

7          Now, whether somebody else was involved -- you know,

8    for anyone who does these cases, we know that often there are

9    other individuals involved in the organization, and they bring

10   in a person known as a "bottom" to manage the girls and set up

11   the dates and take the photos and transport them.  That is

12   something that does happen.  We don't know if that happened in

13   this case and that was the other male's involvement, but even if

14   it was, if others were involved in the trafficking of these

15   girls, it does not negate the guilt of the Defendant.

16         And so the circumstances of this case are egregious.

17   We have three victims.  The weight of the evidence against her

18   is strong.

19         And then, you know, her background is, you know, a

20   compelling reason as well.  I mean, she's been arrested 15 times

21   since the age of 19.  She has a mental health history of bipolar

22   disorder, depression.  She has been arrested for violent crimes

23   including aggravated battery with serious bodily injury,

24   shooting into a vehicle and drug crimes.

25         The Pretrial Services Report has multiple entries for

1    capiases that have been entered which shows that, you know, she

2    does not comply with terms of release.  It reports that she has

3    previously violated terms of her probation.

4         She doesn't work.  She doesn't own property.  She

5    doesn't have custody of her children.  The reporting about where

6    she resides is suspicious.  I mean, she said -- there's, you

7    know, inconsistent reporting where she said -- I think the

8    mother said she lived with her maternal aunt, which is in very

9    close proximity to the address where she was actually residing,

10   where the conduct was taking place, which is in close proximity

11   to the group home where these girls were found.

12        So the Government does not have any, especially in

13   light of the presumption in this case and the circumstances of

14   this case and the circumstances of the Defendant's background,

15   the Government does not have any confidence that if this Court

16   were to give her a bond, that she would comply with the

17   conditions, that she would return to court.

18        You know, she is facing life in prison.  The statutory

19   maximum is life.  She has a very hefty minimum mandatory

20   sentence that she's facing and the guidelines is life.  I mean,

21   it's a very serious case.  The Government does not feel

22   confident that she would return based on all of these

23   circumstances, and that she doesn't have a stable residence to

24   reside in if she were to be released.

25        Thank you.

1    THE COURT:  Okay.  Thank you, Ms. Obenauf.

2    Mr. Michelen, what argument do you have to provide?

3    MR. MICHELEN:  Judge, thank you.

4    Judge, I guess the first thing I want to say is while

5    it does seem obviously, right, based on the complaint and the

6    Agent's testimony, something, you know, was going on here, the

7    Government called it an operating a scheme, clearly, right?

8    There are three victims who allege to have engaged in commercial

9    sex acts and that seems clear.  The question is what was Ms.

10   Barnes' role in this.  The Government mentioned, you know, she

11   recruited them, yet the first thing we heard from the Agent, one

12   of the first things was that Minor Victim One initially was --

13   sounded like recruited by the person later on identified as Cleo

14   or Cleon and Nick, and that that's where Minor Victim One and --

15   who Minor Victim One was staying with.

16   We heard that the FBI has not uncovered any evidence of

17   Ms. Barnes herself posting any solicitations for any of the

18   victims, at least that's what I understood.  I may be wrong, but

19   my understanding was that as of right now, they have not

20   uncovered any evidence, electronic or otherwise, of Ms. Barnes

21   posting or soliciting any of the minors.  Doesn't sound like any

22   of the minors allege that Ms. Barnes threatened any of them.

23   What we do hear is well, we have this guy Cleon and Nick, and

24   they're the ones in the hotel room with Minor Victim One.  We

25   have a situation where the house that was raided, where the FBI

1   found the IP address, you know, linked back to that residence,

2   seven people were living there, one of them apparently had

3   multiple prostitutes in the house, and Ms. Barnes is one of the

4   people living in the house.

5           So while I understand the Government's point, we have a

6   situation where what exactly was Ms. Barnes' role.  And

7   depending on how you frame the situation, depending on how you

8   talked about it, Ms. Barnes could have just as easily been

9   another one of the victims.  I have not heard anything where Ms.

10  Barnes made any money, Ms. Barnes got paid anything, Ms. Barnes

11  posted any, you know, solicitations for dates for sex acts

12  online.  And we do -- what we do see is Minor Victim Two, an

13  account associated with her, making these postings.  So while

14  obviously, of course this is very serious and we have three

15  minor girls, one of them being 11, and that's a serious issue,

16  the question here is what was Ms. Barnes' role in this.

17          And Judge, I think that to call her a recruiter and to

18  make her seem like the person who's running this kind of child

19  sex trafficking ring is a bit of a stretch, Judge.  I mean,

20  there is already, you know, evidence that the FBI has where

21  there seemed to have been males, mutually or directly involved,

22  and it would be counterintuitive to assume that, for example,

23  Cleon or Nick were not the ones pimping out, for lack of a

24  better term, or running these sex acts for these minors.  It

25  just seems counterintuitive to me.

1          Same with the house that was raided.  Again, apparently

2     multiple prostitutes living there.  The idea that Ms. Barnes is

3     somehow the one in charge or the one creating this situation for

4     these minors is not borne out by the evidence.

5          What it does seem is that she's the one that they've

6     arrested, and it seems -- and it's clear, and understandably,

7     that the FBI is continuing to investigate this.  But for

8     purposes of today, Judge, whether or not there's P.C., probable

9     cause for these two counts, these two charges, I don't believe

10    there is for Ms. Barnes soliciting or enticing or forcing any

11    minor to engage in any kind of sex act just because apparently

12    what the evidence shows is sure, she may have been around them,

13    she may have talked to them according to the minors about sex,

14    but in terms of forcing anyone to engage in anything, that's not

15    clear at all from what we've heard today.

16         So in terms of the P.C. aspect, Judge, for those --

17    yes.

18         THE COURT:  Mr. Michelen, because I think this is an

19    important point, but what Ms. Obenauf was asserting, although

20    understanding the Government's argument is that there's evidence

21    of more broad involvement, that under the statute, even just

22    transporting the minors, harboring them, enticing them or

23    soliciting them to engage in the commercial sex, even if it

24    wasn't forced, even if it wasn't, you know, coercion, even if

25    the sex acts didn't actually occur, and even if there's someone

1   else involved, that the statute itself is broad enough to cover

2   even that, even if the involvement was relatively minor.  Do you

3   disagree with that?

4          MR. MICHELEN:  No, Your Honor.  I understand the

5   statute, and I'm not saying that -- yeah, I don't disagree with

6   what the statute would call for.  What I am saying is for

7   example, what we heard, and I may be misremembering, right, we

8   heard that at some point the two minors, Minor Victim Two and

9   Three, were transported to the hotel to do Minor Victim One's

10  hair.  And if I remember correctly, that was Ms. Barnes who did

11  the transporting.  I'm not aware of any other transporting for

12  sex acts that have been actually corroborated by anything other

13  than the recollection of the minors, right.  So you would think

14  these are the kinds of things that would be found in a text, in

15  a WhatsApp, in any kind of communication and from what I heard,

16  that's not something that the FBI is aware of at the moment.

17         In terms of -- I think the Government mentioned

18  harboring.  My understanding is that's not her home, and I don't

19  think the Government or the FBI is alleging that that is -- that

20  that is her home.  She if she was staying there -- sounded like

21  that was the stepdad's home.  So whether or not -- I mean, I

22  guess that would -- based on that argument, all seven people in

23  that house could potentially then also be charged and guilty of

24  sex trafficking a child just because they are around the

25  children.  So that's my point on that, Judge.

1        As for detention, Your Honor, I have spoken with Ms.

2   Barnes' mom.  I have her address.  I think it's also in the --

3   I'm not sure if this one was actually in the bail report, but I

4   could provide it to the Court.  It's the 741 Southwest 9th

5   Street, Apartment 201 in Pompano.  And her mom says she is, of

6   course, more than welcome to stay with her, and I would ask the

7   Court to consider that.

8        This is, Judge, obviously a very serious charge, but

9   surely there are ways to ensure her appearance in court, right.

10  This Court can place a monitor on her.  This Court -- a GPS, an

11  electronic tracking monitor.  Curfews.  There are ways, Your

12  Honor.  And I understand the seriousness of the charge, but it

13  is -- I think it would be much more than reasonable to allow her

14  to remain on bond while fighting this case, especially

15  considering the COVID situation, Your Honor.  If the idea is to

16  provide and allow for bail in as many situations as possible,

17  this does seem like one where the Court can and should allow her

18  to be out on bail while she fights her charges.

19        So that's what we're asking the Court to consider

20  today.

21        THE COURT:  Well Mr. Michelen, how would you articulate

22  what the Defendant has produced to rebut the presumption of

23  either the presumption of both nonappearance and danger to the

24  community?

25        MR. MICHELEN:  Well Your Honor, in terms of producing,

1    I think the argument would be we know where she would stay.  She

2    has no place to go in terms of leaving the district.  And when

3    we put a monitor on someone, I think that -- obviously it's not

4    100%, but it goes pretty far in ensuring appearance, Judge.

5           So the Government mentioned that she has failures to

6    appear.  I saw that in the bail report.  If I remember

7    correctly, and I'm looking again now, but these are -- you know,

8    she's 30 years old, Your Honor.  These are cases from when she

9    was 18 years old.  Most of these the Government mentioned -- I

10   think the Government said 15 arrests.  I haven't counted

11   exactly, but looking now and from what I remember, a lot of them

12   were no valid driver's licenses and suspended licenses and

13   traffic infractions.  A lot of the -- for example, just picking

14   one out, you know, we have a capias was issued for the no valid

15   driver's license in 2013.  That was issued on July 8th.  Within

16   three weeks it was served.  They found her, right.  So I

17   remember I was a state court public defender, capiases get

18   issued pretty frequently and then the person is found right

19   away.

20          The same thing happened with her next case in 2014.

21   The capias was issued on April 24, 2014, the capias was

22   withdrawn within less than a month, on May 20th.

23          So these weren't situations where she was fleeing the

24   jurisdiction, the county, the state, the country.  It sounds

25   like a situation where it was a no valid driver license, cop

1    showed up at the house and there she is, and they told her to go

2    to court.

3         THE COURT:  In a lot of instances, Mr. Michelen, I

4    think I would agree with you on that score, especially if in the

5    state system capiases get issued with some frequency and they're

6    not always an indication of really unreliability by the

7    defendant.  But, I mean, looking at the Pretrial Services Report

8    we're talking about 2013, 2014.  Twice in 2014. 2015, twice in

9    2015.  And then twice in 2019.  All of these cases have capiases

10   issued, sometimes multiple times.  It seems -- none of those

11   were cases in which she was facing a guideline range of life.  I

12   mean, doesn't -- I'm not sure how we deal with the fact that it

13   seems like a repeated behavior or repeated unreliability in much

14   less serious circumstances than she's facing here.  How can I

15   address that?

16        MR. MICHELEN:  Your Honor, I understand your point and

17   unfortunately, I can't speak to why those judges issued those

18   capias, what exactly are the details behind them.  What I can

19   say, Your Honor, is, you know, electronic monitoring goes a long

20   way in terms of ensuring her appearance.  I mean, we know

21   probation would know if, for example, the monitor gets cut off,

22   you know, taken off the leg, probation would know right away.

23   It's not like theoretically we're going to run a hypothetical of

24   her trying to flee.  She wouldn't get much of a head start, Your

25   Honor.  The second it's taken off, the second the battery is not

1   charged, she would have US Marshals at her door and she

2   understands that.  And we can never ensure any defendant's

3   appearance 100%, but I would argue that in this case, Judge, if

4   we know where she's going to be living, if we put a monitor on

5   her with a curfew, with reporting requirements, you know, phone

6   reporting and whatever else Probation deems appropriate, Judge,

7   that could be alleviated.  Obviously if there's ever an instance

8   where she doesn't report by phone or in person or just misses,

9   violates any one condition, this Court would have the authority

10  to take her into custody pending the resolution of her case.

11  But of course there are ways, right?  There are ways to ensure

12  someone appears, and I think the Court could fashion those in

13  this case.

14          THE COURT:  Let me just turn back to the Government for

15  a moment.

16          Ms. Obenauf, first just as to the probable cause

17  argument, there does seem like one of the things that does

18  trouble me is there seems to be lot of reliance in the theory

19  about Victim Two, that the Defendant was allowing her to stay at

20  the residence and that, you know, a lot of the postings were

21  coming from the residence.  But, you know, given the number of

22  people in the residence, you know, can the Court rely on those

23  circumstances as probable cause to suggest that the Defendant

24  was actually involved in, you know, controlling Victim Two or

25  allowing Victim Two to stay there or anything of that nature?

```
1            MS. OBENAUF:  Well, in a vacuum, sure.  But the victims
2    have not identified any other individual as being involved with
3    setting prices, recruiting them, showing them hey, you can make
4    all this money if you engage in commercial sex.  Bringing guys
5    over to the house.  There has not been a single person
6    identified by any of the three victims as doing that conduct
7    except for the Defendant.  And so with circumstantial evidence,
8    you cannot ignore the surrounding circumstances.  Sure, if
9    there's seven people in a house and there was an electronic
10   transmission or a posting from that house, the first question
11   would be who is it.  If you have no other information, I would
12   agree with you, except that in this case, witness testimony or
13   statements from witnesses is absolutely evidence that even a
14   jury can rely on to prove a case beyond a reasonable doubt
15   without anything else.
16            So we're talking about a probable cause standard, and
17   you have the two victims saying that she told me that if I
18   engaged in this, that I could make a lot of money.  She brought
19   guys over, you know.  I told her stop posting me.  I didn't want
20   to do this.  I lived in her house.  The stepdad wasn't the point
21   of contact for the victim, Minor Victim Two, it was the
22   Defendant.
23            So this case is not one that you can review in a
24   vacuum, and when you're talking about probable cause, such a low
25   standard to begin with, you know, we have more than met that
```

1    threshold.

2         But sure, I mean, you know, you have to evaluate and

3    consider what the victims are saying.  I mean, we can't

4    disregard what the victims are saying, especially when they're

5    giving consistent statements, and Minor Victim One doesn't even

6    know Minor Victims Two and Three.  So their statements establish

7    probable cause standing alone.  The electronic evidence

8    corroborates what they are saying.

9         THE COURT:  What about the Defendant's -- in terms of

10   detention, what about the Defendant's proposal that electronic

11   monitoring with other supervision and living at the mother's

12   house, why would that not be a sufficient remedy to ensure the

13   Defendant's appearance?

14        MS. OBENAUF:  I think if she cut the monitor,

15   realistically we would be able to find her at some point in

16   time.  I think the Government's primary concern is danger in

17   this case, especially based on the manner that she committed

18   these crimes.  You know, you can confine her to the monitor and

19   that may help us track her movements after the fact when we

20   learn that she's trafficked another minor.  You could, you know

21   -- but that is not okay.  That should not be okay.

22        And we're not talking about a victimless crime here.

23   We're talking about one of the most egregious victim crimes.  If

24   the Defendant were to -- she doesn't have a job, she doesn't

25   have a source of income.  She committed these crimes from her

residence.  You know, she was having customers come to her
residence where the minor was to try to get her to engage in
commercial sex.  There's nothing stopping her when she's out and
needs some money.  And there's no assurance that this Court can
have that that won't happen.

And the problem is that putting her out in the
community and even having the slightest risk, you know, we're
not talking about, you know, another, you know, fraudulent
credit card being obtained.  We're talking about another minor,
a child, being victimized, being trafficked.  And in this case,
you know, 11 years old is probably the youngest victim that I
have encountered in a sex trafficking case.  It just can't
happen again.

And based on her instability, you know, her -- you
know, inconsistency, her noncompliance, her repeated
noncompliance which, as the Court pointed out in situations much
less serious than this we just -- there are no conditions that
we can impose that will ensure primarily the safety of the
community.

THE COURT:  Okay.  What I'd like to do is take a couple
minute break so that I can just review things.  I'll come back
in about five minutes and give my ruling.  But everyone can take
a break for five minutes and we'll reconvene.  I have 12:37.
Why don't we actually say 12:45, we'll reconvene then and we'll
get going then.

1          MR. MICHELEN:  Thank you, Your Honor.

2          (Recess)

3          THE COURT:  Okay, folks.  I'm ready to go back on the

4     record, if everyone could please come back.

5          So the first question the Court has to address is the

6     matter of probable cause for purposes of the preliminary

7     examination hearing.  And I ultimately do find that the

8     Government has submitted sufficient evidence to find probable

9     cause as to Victim One and Victim Two.  I think the defense has

10    pointed out a number of ways in which the evidence is not

11    necessarily overwhelming or doesn't necessarily paint the

12    picture of the Defendant being the master orchestrator of some

13    of the crimes that are described.

14         However, I do think a couple of things are significant

15    on this score.  One, as the Government has pointed out, it is

16    sufficient for if the Defendant harbored either of the victims,

17    even advertised them or really encouraged or assisted them here

18    in committing the commercial sex act.  And so even if -- even

19    if, as the Government said, even if the Defense is correct in

20    the theory that one of the other -- one of the men involved,

21    whether it is Moe or Nick or stepfather or any of these

22    individuals, even if they were the ones ultimately pulling the

23    strings or running the show in some way, and there's no evidence

24    necessarily to rely on in that regard, but it seems like a

25    possibility based on what we've heard, I think there's enough

1    evidence of the Defendant's role to find probable cause in the

2    crimes that are charged.

3         I do find it significant that the three minor victims'

4    testimony does corroborate -- seems to corroborate each other,

5    and that they're all pointing to the Defendant as the one who

6    was encouraging them to engage in the sex acts.  Victim One has

7    stated that the Defendant drove her around or brought men to the

8    hotel and gave them directions, and that does seem consistent

9    with what Victim Two and Victim Three have also said.  I think

10   the fact that their respective statements are consistent with

11   each other, I think does help to establish probable cause.

12        As to the ads that Victim Two is posting, again, the

13   evidence is unclear whether Victim Two is making those posts

14   herself, and so whether she felt like she was doing that because

15   the Defendant was telling her she needed to pay rent or the

16   stepfather was telling her to pay rent, it seems like there is

17   sufficient evidence that the Defendant continued to either

18   assist her with posting some of those ads or was bringing men to

19   her as an opportunity to engage in the commercial sex acts which

20   that itself would satisfy the statute.  So I think there is at

21   least probable cause to believe that the Defendant has committed

22   the offenses involved.

23        So having made that finding, I need to turn to the

24   issue of detention, and I have to determine whether the

25   Government's met its burden of proving that no condition or

1    combination of conditions would reasonably assure the

2    Defendant's appearance as required.  The Government's burden

3    there is by a preponderance of the evidence.  I also must

4    determine whether the Government's met its burden of proving by

5    clear and convincing evidence that the Defendant is a danger to

6    the community.  That means is the evidence sufficient to create

7    an abiding conviction that future danger is highly probably.

8         I first need to assess the extent of any risk, and then

9    determine whether any condition or combination of conditions

10   would reasonably mitigate the risk.  Given that I've found

11   probable cause to believe the Defendant committed the charged

12   offense, that creates a rebuttable statutory presumption that no

13   condition or combination of conditions would reasonably assure

14   the Defendant's appearance as required and the safety of the

15   community.  Regardless of this presumption, the burden is still

16   on the Government to prove that detention is required.  And even

17   if that presumption is rebutted, the presumption remains as

18   evidence to be considered.

19        There are four statutory factors that I do need to

20   consider.  First is the nature of the offense, and I do agree

21   with the Government that the nature of the offense itself is

22   incredibly serious involving the trafficking of minors, and

23   particularly Minor Victim One being 11 or 12 years old with

24   evidence that the Defendant was aware that she was so young,

25   that simply makes this an incredibly, incredibly serious

```
1     offense. And even if the Defendant was not the ringleader, even

2     if -- even if we credit the idea that she may have initially

3     been recruited by the Defendant's ex-boyfriend or someone else,

4     even involvement in facilitating trafficking of a victim so

5     young has to be considered incredibly serious.

6            The weight of the evidence.  As I said, I don't think

7     the weight of the evidence is overwhelming that the Defendant

8     was the -- was necessarily the primary organizer or the primary

9     person causing the victims to engage in commercial sex acts, but

10    I do think at least there is sufficient evidence -- as I said,

11    there's sufficient evidence to find probable cause that she was

12    involved in enticing or harboring or encouraging or maintaining

13    or transporting Victim One and Victim Two.  I don't think the

14    weight of the evidence is overwhelming, and there may be issues

15    that come up as you get closer to trial and do further

16    discovery.  So the weight of the evidence is -- it's hard to say

17    which way that tilts things.

18           I should have mentioned as to the nature of the

19    offense, I do find it significant that there is a 15-year

20    mandatory minimum and a maximum of life, and a guideline range

21    of life.  Obviously that underscores how serious the nature of

22    the offense is.

23           Then I have to consider the Defendant's history and

24    characteristics.  And here, I think these weigh fairly heavily

25    against the Defendant.  She does have family ties in the area.
```

1    Her mother, her father, her stepfather apparently, multiple

2    adult siblings.  Unfortunately, it feels like a lot of the

3    family may be -- well, let me back up there.  The thing that

4    concerns me most about whether the Defendant can be released on

5    bond here is all the conflicting information about her

6    residence.  The Government alluded to this before, but there

7    seems to be a lot of confusion and confliction about where she's

8    living.  The Defendant herself told the FBI that she is living

9    at this -- the address where it appears most of or a lot of the

10   commercial sex activity took place with a whole bunch of other

11   people.  The Defendant now says she's living with her romantic

12   partner, Mr. Birch, for the past month, although Mr. Birch says

13   that she's been living there much longer, since August, which

14   again seems to conflict with what the evidence in this case was.

15   I'll point out that Mr. Birch, according to Pretrial Services

16   Report, says his minor daughters reside there every other

17   weekend and that he doesn't have roommates which is -- seems to

18   be contrary to what the Defendant represented to Pretrial

19   Services.  She says she's told Pretrial Services that she was

20   renting a room, but she can't remember where.  And in conflict

21   with all of this, her mother says that the Defendant has been

22   living with her aunts all her life which is near, but not the

23   same place as this residence where the evidence is suggesting

24   all of or much of the criminal activity here was going on.

25           Now, the Defendant has put forward that she can live

1    with her mother, and her mother says that she can live there and

2    that we can place her on monitoring and have her living there.

3    My concern though is that the evidence of what was going on in

4    the place where the Defendant was actually living sounds like

5    such an awful situation that I have to question why she wasn't

6    then living with the mother to begin with.  And given all of the

7    questions about where she has been living, where she says she's

8    been living and all the details surrounding that, and the fact

9    that I don't have any evidence about the mother's residence and

10   how suitable a residence it would be for her, I don't have a

11   strong faith that I can rely on her living with her mother.

12   Even with electronic monitoring, have an abiding faith that it

13   will ensure her appearance and will ensure her compliance with

14   the terms of a bond.

15          Other parts of her past conduct also undermine my faith

16   that she would be able to comply with a bond.  One of those is

17   her mental health.  That's not something that is her fault, but

18   I note that she does have bipolar disorder.  She indicated she

19   told Pretrial Services that she hasn't taken her medication in

20   the last month.  There's evidence that she was Baker Acted in

21   2016.

22          In addition to all of that, we have her criminal

23   history which, as the Government indicated, is fairly lengthy.

24   It does involve some violent offenses including a shooting into

25   a vehicle for which there was a violation of probation.  A

1    number of the offenses were driving offenses which might
2    ordinarily seem to be relatively minor, but as I discussed with
3    defense counsel, the fact that it seems like every single case
4    across many years, and most recently in 2019 just last year
5    there are capiases issued, again shakes my faith that she will
6    abide by the conditions of her bond and appear as directed.
7            So given all of the information that is in front of me,
8    I don't think -- and especially combining all of that with the
9    nature of the offense, the amount of time the Defendant is
10   looking at, I don't think the defense has rebutted the
11   presumption that no conditions will reasonably assure her
12   appearance.  I think there is a strong risk that the Defendant
13   does pose a danger to the community given the fact that much of
14   the criminal activity was occurring where she was living, and I
15   don't have an abiding faith that she wouldn't continue that
16   activity if released on bond.
17           I don't think I can say that the Government's evidence
18   is clear and convincing to find that she's *(unintelligible)*, I
19   think it's sufficient to say that the evidence by a
20   preponderance says that no condition or combination of
21   conditions will reasonably assure her appearance or her abiding
22   by the conditions of a bond I would set.
23           And so based on that, I'm going to find that the
24   Defendant should be detained prior to trial, and I will remand
25   her to the custody of the United States Marshal.  I'll issue a

1   written order summarizing those findings.

2         Having made those findings, are there any other matters

3   that we need to address regarding the Defendant at this time?

4   First from the Government?

5         MS. OBENAUF:  Nothing from the Government.

6         THE COURT:  Mr. Michelen, anything from you?

7         MR. MICHELEN:  No, Your Honor.  Thank you.

8         THE COURT:  I will note one thing.  Arraignment is set

9   in this case for February 22nd.  Mr. Michelen, the standing

10  discovery order hasn't been entered yet.  Obviously if you wish,

11  I can enter that now or if you can make a request at a later

12  time even prior to indictment to enter the standing discovery

13  order.

14        MR. MICHELEN:  Yes, Your Honor.  If you would please

15  enter the standing discovery order, I would appreciate it.

16        THE COURT:  Okay.  The Court will enter the standing

17  discovery order.  The Brady warnings under Rule 5 F have already

18  been given, so there's no need to do that again.

19        Again, we'll enter an order regarding detention later

20  today or tomorrow.

21        If there's nothing else regarding the Defendant that we

22  need to address, as I said arraignment is set for February 22nd,

23  we will stand in recess.  I do want to wish everyone a Happy New

24  Year, and we will stand in recess.  Thank you everyone.

25        MR. MICHELEN:  Thank you, Judge.  And likewise.

PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

1          (PROCEEDINGS CONCLUDED)

2                * * * * *

3            C E R T I F I C A T E
   I certify that the foregoing is a correct transcript from the
4  digital audio recording of proceedings in the above-entitled
   matter.

5

6  1-26-2021          /s/ Dawn M. Savino, R.P.R., C.R.R.
   Date               DAWN M. SAVINO, R.P.R., C.R.R.
7

8                I N D E X

9               WITNESSES

10  ALL WITNESSES:                          PAGE:

11  For Government:

12   Alex Loff:
      Cross-Examination by Mr. Michelen        15:6
13    Redirect Examination by Ms. Obenauf      33:13

14               EXHIBITS

15  None

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION